**GRAY KNOX MARBLE COMPANY**

v.

**UNITED STATES of America.**

**Civ. A. No. 5347.**

United States District Court
E. D. Tennessee, N. D.

June 8, 1966.

---

H. M. Harton, Jr., Frantz, McConnell & Seymour, Knoxville, Tenn., Joseph B. Brennan, Willis B. Snell, Sutherland, Asbill & Brennan, Washington, D. C., for plaintiff.

J. H. Reddy, U. S. Atty., Chattanooga, Tenn., G. Wilson Horde, Asst. U. S. Atty., Knoxville, Tenn., for defendant.

## MEMORANDUM

ROBERT L. TAYLOR, Chief Judge.

This is a suit for refund of federal income taxes in the amount of $246,241.36, with statutory interest for the calendar years 1953 through 1959 and a portion of the year 1960.

Jurisdiction is derived from 28 U.S.C. § 1346(a) (1).[1]

Plaintiff is the corporate successor of Gray Knox Marble Company, a Delaware corporation, (hereafter referred to as taxpayer) which was liquidated and dissolved on June 3, 1960. Taxpayer was an integrated producer of dimension marble. It quarried marble blocks in the vicinity of Knoxville; it sold some of such blocks suitable for dimension stone and manufactured marble products from the rest in a mill located in Knoxville; it also manufactured marble products in its mill from blocks and slabs purchased from other producers in Tennessee and other states, and in a small number of foreign countries. A number of the blocks quarried were not suitable for dimension stone and beginning in 1955 some of these blocks, which had previously been waste, were used to manufacture "split-face ashlar," a product consisting of marble sawed to a specified thickness, broken rather than sawed by a machine called a guillotine into pieces of desired sizes which were used for masonry walls.

The sole issue involves the method to be used to compute the deduction for percentage depletion which was allowable to taxpayer for the marble blocks which it quarried from 1953 through its last short taxable year in 1960.

Section 23(m) of the Internal Revenue Code of 1939 [2] (applicable to 1953) and Section 611(a) of the Internal Revenue Code of 1954 [3] (applicable to 1954 and the subsequent years here involved) provide that taxpayer is entitled in computing net or taxable income, to a deduction for depletion of natural mineral deposits.

---

1. § 1346. *United States as defendant*
 (a) The district courts shall have original jurisdiction, concurrent with the Court of Claims, of:
 (1) Any civil action against the United States for the recovery of any internal-revenue tax alleged to have been erroneously or illegally assessed or collected, or any penalty claimed to have been collected without authority or any sum alleged to have been excessive or in any manner wrongfully collected under the internal-revenue laws; * * *

2. SEC. 23. DEDUCTIONS FROM GROSS INCOME
 In computing net income there shall be allowed as deductions:
 * * * * *
 (m) *Depletion.*—In the case of mines, oil and gas wells, other natural deposits, and timber, a reasonable allowance for depletion and for depreciation of improvements, according to the peculiar conditions in each case; such reasonable allowance in all cases to be made under rules and regulations to be prescribed by the Commissioner, with the approval of the Secretary. * * *

3. SEC. 611. ALLOWANCE OF DEDUCTION FOR DEPLETION.
 (a) GENERAL RULE.—In the case of mines, oil and gas wells, other natural deposits, and timber, there shall be allowed as a deduction in computing taxable income a reasonable allowance for depletion and for depreciation of improvements, according to the peculiar conditions in each case; such reasonable allowance in all cases to be made under regulations prescribed by the Secretary or his delegate. * * *

Section 114(b) (4) (A) (i) of the 1939 Code [4] and Section 613 of the 1954 Code [5] provide that this deduction for certain ores or mineral shall be computed as a specified percentage of "gross income from the property" but not to exceed 50% of the "net" or "taxable" income "from the property" computed without allowance for depletion. Section 114(b) (4) (A) (i) of the 1939 Code provides a rate of 5% for marble and Section 613(b) (6) of the 1954 Code provides (with certain exceptions not applicable here) a 15% rate.

4. SEC. 114. BASIS FOR DEPRECIATION AND DEPLETION.

 \* \* \* \* \*

(b) *Basis for depletion.—*

 \* \* \* \* \*

(4) [as amended by Sec. 145 of the Revenue Act of 1942, c. 619, 56 Stat. 798, and Sec. 319(a) of the Revenue Act of 1951, c. 521, 65 Stat. 452] *Percentage depletion for coal and metal mines and for certain other mines and natural mineral deposits.*

(A) *In general.* The allowance for depletion under section 23(m) in the case of the following mines and other natural deposits shall be—

(i) in the case of \* \* \* marble, \* \* \* 5 per centum,

 \* \* \* \* \*

of the gross income from the property during the taxable year, excluding from such gross income an amount equal to any rents or royalties paid or incurred by the taxpayer in respect of the property. Such allowance shall not exceed 50 per centum of the net income of the taxpayer (computed without allowance for depletion) from the property, except that in no case shall the depletion allowance under section 23(m) be less than it would be if computed without reference to this paragraph.

(B) [as added by Sec. 124(c) of the Revenue Act of 1943, c. 63, 58 Stat. 21, and amended by Sec. 207(a) of the Revenue Act of 1950, c. 994, 64 Stat. 906, and Sec. 304(d) of the Excess Profits Tax Act of 1950, c. 1199, 64 Stat. 1137] *Definition of Gross Income from Property.* As used in this paragraph the term 'gross income from the property' means the gross income from mining. The term 'mining' as used herein shall be considered to include not merely the extraction of the ores or minerals from the ground but also the ordinary treatment processes normally applied by

The issue turns on the interpretation and application of Treasury Regulations defining "gross income from the property."

The parties are in agreement that taxpayer's "gross income from the property" is equal to that amount of its gross income attributable to the marble quarried in block form exclusive of any income attributable to the subsequent manufacturing or other operations.[6] It is also agreed that the applicable rules for determining the amount of gross income so attribut-

mine owners or operators in order to obtain the commercially marketable mineral product or products \* \* \*

5. SEC. 613. PERCENTAGE DEPLETION.

(a) *General Rule.—*In the case of the mines, wells, and other natural deposits listed in subsection (b), the allowance for depletion under section 611 shall be the percentage, specified in subsection (b), of the gross income from the property excluding from such gross income an amount equal to any rents or royalties paid or incurred by the taxpayer in respect of the property. Such allowance shall not exceed 50 percent of the taxpayer's taxable income from the property (computed without allowance for depletion). \* \* \*

(b) *Percentage Depletion Rates.—*The mines, wells, and other natural deposits, and the percentages, referred to in subsection (a) are as follows:

 \* \* \* \* \*

(6) 15 percent—all other minerals (including, but not limited to \* \* \* marble, \* \* \*

(c) *Definition of Gross Income From Property.—*For purposes of this section—

(1) *Gross Income From the Property.—*The term 'gross income from the property' means, in the case of a property other than an oil or gas well, the gross income from mining.

(2) *Mining.—*The term 'mining' includes not merely the extraction of the ores or minerals from the ground but also the ordinary treatment processes normally applied by mine owners or operators in order to obtain the commercially marketable mineral product or products, \* \* \*

6. It is to be observed that Section 114(b) (4) (B) of the 1939 Code and Section 613(c) of the 1954 Code, heretofore

able are as set forth in § 39.23(m)–1(e) (3) of Treasury Regulations 118.[7]

It is to be observed that this regulation provides four rules for computing "gross income from the property" which, insofar as applicable to this case, are summarized as follows:

(1) If the taxpayer sells the crude mineral product [i. e., marble blocks] in the immediate vicinity of the mine, "gross income from the property" means the amount for which it is sold.

(2) If the product is transported or processed before the sale, then he is to use "the representative market or field price (as of the date of sale) of a mineral product [i. e., marble blocks] of like kind and grade * * *."

(3) If there is no such market or field price, then he is to use the representative market or field price of the first marketable product resulting from processing minus the costs and proportionate profits attributable to such processing (commonly referred to as the "proportionate profits" method).

(4) If the taxpayer establishes to the satisfaction of the Commissioner that a method other than the proportionate profits method "clearly reflects" gross income from the property, that other method shall be used.

The parties are in agreement that under the first rule set forth in the regulation the aggregate sales price of the quarry blocks sold by the taxpayer represents the "gross income from the property" as to the blocks sold. The issue before the Court is the method to be used to determine "gross income from the property" with respect to the blocks not sold but used in taxpayer's plant to manufacture finished products.

Plaintiff contends that sales of quarry blocks by it to others, or, if not by it to others, then sales by its competitors to others, establish a representative market or field price which should be used pursuant to Rule (2) set forth in the regulations.

Defendant contends that no such prices were established and that the proportionate profits method should be used pursuant to Rule (3).

It is, therefore, our function under the facts of this case to determine which of the rules properly applies for the determination of taxpayer's gross income for depletion purposes.

Many of the facts are stipulated:

Taxpayer, during the period in question, was engaged in quarrying, buying and selling marble which it, or its ven-

quoted, provide that "gross income from the property" means "gross income from mining." "Mining" is defined to include not only "extraction of the * * * minerals from the ground" but also certain processing and transportation. The parties agree that "mining" under the facts of this case includes only extraction of the marble from the ground and its removal to the quarry rim.

7. Treasury Regulations 118, § 39.23(m)–1(e) (3).
 "(3) If the taxpayer sells the crude mineral product of the property in the immediate vicinity of the mine, 'gross income from the property' means the amount for which such product was sold, but, if the product is transported or processed (other than by the ordinary treatment processes described below), before the sale, 'gross income from the property' means the representative market or field price (as of the date of sale) of a mineral product of like kind and grade as beneficiated by the ordinary

treatment processes actually applied, before transportation of such product other than transportation treated, for the taxable year, as mining). If there is no such representative market or field price (as of the date of sale), then there shall be used in lieu thereof the representative market or field price of the first marketable product resulting from any process or processes (or, if the product in its crude mineral state is merely transported, the price for which sold) minus the costs and proportionate profits attributable to the transportation (other than transportation treated, for the taxable year, as mining) and the processes beyond the ordinary treatment processes. If the taxpayer establishes to the satisfaction of the Commissioner that another method of computation, other than the computation of profits proportionate to costs, clearly reflects the gross income from the property, then such gross income shall be computed by the use of such other method."

dees, sawed to specified dimensions and manufactured into marble products of various shapes for use as monumental stone or for building and construction purposes such as exterior and interior walls, columns, steps, sills, wainscoting and railings.

Taxpayer in 1955 began the manufacture and sale from marble blocks which it quarried of split-face ashlar, the units of which were approximately 3⅝ inches in depth, and varied in length from approximately 1 foot to 4 feet, and in height from approximately ⅞ inch to 7¾ inches.

During the period involved, taxpayer owned and operated one quarry (Gray Knox Quarry) in Knox County and two quarries (French Pink and Brown Quarries) located in Blount County, Tennessee from which it quarried blocks of marble by the use of channeling machines and/or broaches. The blocks were inspected at the quarry. Because of their size, inherent cracks or other weaknesses in the marble, or color, a portion of the blocks quarried were unsuitable for sale or manufacture as dimension stone. Those which were suitable were either sold to customers "as is" at the rim when orders were received or when needed were sent for processing to the mill owned and operated by taxpayer. Those which were determined to be unsuitable were either placed on dumps at the quarries, sold for other uses, or beginning in 1955, shipped to the mill for manufacture and sale as split-face ashlar.

The blocks quarried which were suitable for the purposes of taxpayer were designated as No. 1, No. 2 or No. 3. A No. 1 block was one of satisfactory color which could be sawed into sound slabs substantially all of which were at least six feet in length and three feet in width or five feet in length and five feet in width. A No. 2 block was one which does not qualify as No. 1 in size, soundness or color, but which could produce sound slabs large enough for use for facing for interior and exterior walls. A No. 3 block was one which produced only the smaller pieces of dimension stone such as window sills, floor tiles and thresholds.

The blocks which were suitable for the products manufactured by taxpayer and which were shipped to the mill were sawed there by gang saws to slabs of various thicknesses. Some of these slabs were sold to customers. Others were manufactured by further sawing, cutting and polishing. Marble blocks and slabs purchased from other quarries were subjected to similar processing.

The blocks, determined at the quarry to be unsuitable for taxpayer's use in the manufacture of monumental stone or for building and construction purposes but suitable for split-face ashlar, were shipped to the mill and sawed into slabs by gang saws, which were then broken to rough-edged pieces of the desired sizes.

During the years involved, taxpayer sold low-grade or waste blocks, cobbles and fragments from its quarry to The Standard Lime and Stone Company for use in the manufacture of lime on the basis of a return in the nature of a royalty of 25 cents per ton on the lime produced by the rock. Two tons of marble produced one ton of lime. The largest number of tons sold for lime was 41,471.92 in 1953; and the lowest number, 878.16 in 1959.

During the years here involved, taxpayer quarried and processed in its mill the following quantities of marble, for monumental stone or for building and construction purposes and for split-face ashlar:

| Year | Cubic Feet of Blocks Used for Products | Cubic Feet of Blocks Used for Split-Face Ashlar |
| --- | --- | --- |
| 1953 | 114,669–7 | — |
| 1954 | 143,964–11 | — |
| 1955 | 118,213–9 | 26,208–3 |
| 1956 | 121,646–11 | 62,925–1 |
| 1957 | 111,411–10 | 78,422–2 |
| 1958 | 110,459–0 | 68,401–0 |
| 1959 | 91,252–8 | 66,043–11 |
| 1–1–60 to 6–3–60 | 33,856–1 | 25,382–1 |

During the same years, taxpayer processed in its mill, the following quantities of purchased marble for the same products:

| Year | Cubic Feet |
|------|-----------|
| 1953 | 27,489–0 |
| 1954 | 23,226–6 |
| 1955 | 19,756–6 |
| 1956 | 26,390–9 |
| 1957 | 22,366–0 |
| 1958 | 15,024–4 |
| 1959 | 21,845–1 |
| 1–1–60 to 6–3–60 | 4,277–5 |

During the years involved, the net sales of products produced in its mill from the marble blocks which it quarried and from those which it purchased averaged around $1,500,000.00, except for the short year of 1960 when the sales amounted to over a half million dollars.

During the years involved, the lowest quantity of dimension stone sold in block form of the quantities produced was 3.-18% and the highest was 9.3%.

The following is a comparison of the quantities of quarried blocks sold, with quantities of quarried blocks used in the mill to produce dimension products other than ashlar:

| Year (1) | Quantities Sold Direct (2) | Quantities Processed (3) | Total (Col. 2 & 3) (4) | Percent (Col. 2 ÷ 4) (5) |
|------|------|------|------|------|
| 1953 | 11,789–10 | 114,669–7 | 126,558–5 | 9.3 |
| 1954 | 5,774–1 | 143,964–11 | 149,739–0 | 3.85 |
| 1955 | 5,267–4 | 118,213–9 | 123,481–1 | 4.26 |
| 1956 | 8,509–1 | 121,646–11 | 130,156–0 | 6.53 |
| 1957 | 5,557–11 | 111,411–10 | 116,969–9 | 4.75 |
| 1958 | 6,809–0 | 110,459–0 | 117,268–0 | 5.8 |
| 1959 | 3,000–5 | 91,252–8 | 94,253–1 | 3.18 |
| 1960 | 1,242–10 | 33,856–1 | 35,098–11 | 3.53 |

During these years considerably more of No. 1 blocks were sold than No. 2 and No. 3 blocks, and at a higher price. The year 1954 is fairly representative:

| 1954 | Cubic Feet | Net Price | Average Price |
|------|-----------|-----------|---------------|
| No. 1 | 3,088–11 | $15,512.06 | $5.02 |
| No. 2 | 2,131–9 | 9,247.41 | 4.34 |
| No. 3 | 553–5 | 1,383.54 | 2.50 |
| Total | 5,774–1 | $26,143.01 | 4.53 |

Six of the purchasers, five of whom were in states other than Tennessee, quarried marble blocks. Candoro Marble Company, one of the purchasers, does not quarry, but is under the common ownership of John J. Craig Company, which does quarry. Twelve purchasers which did not quarry blocks purchased blocks from taxpayer during this period. None of these were located in Tennessee.

Tennessee Marble Company, John J. Craig Company, Friendsville Marble

Company, Imperial Black Marble Company and Appalachian Marble Company quarried and sold marble in Tennessee during the period involved.

John J. Craig Company made the following sales at the following prices during the year 1960, which appear to be fairly representative:

### 1960

| | Cubic Feet | Sales Price | Average Price |
|---|---|---|---|
| No. 1 Blocks | 300–0 | $1,950.00 | $6.50 |
| Rosemont Blocks | 415–8 | 2,286.19 | 5.50 |
| Large Tile Blocks | 22–6 | 101.25 | 4.50 |
| Tile Blocks | 139–3 | 487.38 | 3.50 |
| Total | 877–5 | $4,824.82 | 5.50 |

The blocks sold by John J. Craig Company constituted from 2% to 4% of the total blocks quarried by that company.

Friendsville Marble Company entered a contract dated August 4, 1953 with Vermont Marble Company by which it agreed to sell its entire production to Vermont Marble for a period of ten years. The contract was amended some time during 1956 to change the price for Endsley Fleuri blocks from $2.50 to $3.50 per cubic foot, f. o. b. Friendsville. The year 1954 appears to be representative of the sales under this contract:

### 1954

| Contract Price | Cubic Feet | Total Price | Average Price |
|---|---|---|---|
| $2.00 | 6,556 | $12,306.00 | $1.88 |
| 2.50 | 223 | 557.00 | 2.50 |
| 4.50 | 13,220 | 58,775.00 | 4.45 |
| Total | 19,999 | $71,638.00 | 3.58 |

During the period of the contract, other grades of marble were sold by Friendsville to Vermont at a contract price of $2.00 per cubic foot.

The companies usually made allowances for marble blocks that did not come up to the classification under which they were sold.

Tennessee Marble Company, during this period, sold quantities of ashlar marble blocks and cobbles which it quarried to Candoro Marble Company at prices of from 80 cents per cubic foot at the highest to 40 cents per cubic foot at the lowest. The amounts of these sales appear to be small in comparison with the amounts produced and sold by taxpayer.

Code section 613(c) (2) defines "mining" as not only the extraction of the mineral from the ground, but also "the ordinary treatment processes normally applied by mine owners or operators in order to obtain the commercially marketable mineral product or products." This definition was considered by the Court in the case of United States v. Cannelton Sewer Pipe Company, 364 U.S. 76, 80 S. Ct. 1581, 4 L.Ed.2d 1581 (1960). In that case, the taxpayer was a miner-manufacturer of burnt clay products. It owned and operated an underground mine from which it produced fire clay and shale in proportions of 60% fire clay and 40% shale. Not all of the clays and shales were suitable for taxpayer's operation.

Taxpayer's clay was the deepest clay mined in Indiana. Its cost of removing and delivering the same to its plant was $2.418 per ton in 1951. It used some 38,473 tons of clay and shale in its operations that year and sold approximately 80 tons of ground fire clay and shale in bags at a price of $22.88 per ton. Net sales of its finished wares amounted to approximately one and a half million dollars. There was no market for the fire clay and shale which taxpayer utilized to manufacture sewer pipes and other vitrified articles. Taxpayer claimed that it could not profitably market its raw fire clay and shale without processing them into finished products. The Court held that taxpayer's depletion allowances must be based not upon the value of the sewer pipe and other vitrified products which it manufactured, but upon the value of its raw fire clay and shale after application of ordinary treatment processes normally applied in the recovery of those materials by miners not engaged in the manufacture of finished products.

In the course of its opinion, the Court observed that the value of the taxpayer's vitrified clay products, obtained by expensive manufacturing processes, bears little relation to the value of its minerals. The record showed that ⅗ths of the fire clay produced in Indiana was sold in its raw state; large sales of raw fire clay and shale were made across the river in Kentucky, all of which indicated that fire clay and shale were commercially marketable in their raw state, "unless that phrase also implies marketability at a profit. We believe it does not," said the Court.

The Court stated that if taxpayer were permitted to base its depletion upon the value of the sewer pipe and other vitrified products which it manufactured, rather than upon the value of the raw fire clay and shale, after application of ordinary treatment processes, would give it a preference over the ordinary non-integrated miner and a decisive advantage over its non-integrated manufacturer-competitor. The Court stated that de-pletion under the statute was defined not to compensate for costs of recovery, but for exhaustion of mineral assets alone; that if extended as contended for by the taxpayer, "the miner-manufacturer would enjoy, in addition to a depletion allowance on his minerals, a similar allowance on his manufacturing costs, including a depreciation on his manufacturing plant, machinery and facilities."

■ The mining ended in the present case when the rough marble blocks were brought to the rim of the quarry ready for shipment. Virginia Greenstone Company v. United States, 308 F.2d 669 (C.A.4).

Having determined the "commercially marketable mineral product," the next step is to compute the taxable gross income from that product. The regulations heretofore quoted provide that if the product is sold by the taxpayer in the vicinity of the mine "gross income from the property" means the actual amount for which it is sold, but if not, then the taxpayer's gross income from mining is to be constructively computed (1) by using the representative market or field price (as of the date of the sale) of a mineral product of like kind and grade to the taxpayer's mineral product, and (2) if there is not such representative market price, by what is called the "proportionate profits method." By the latter method, computation is made by which the sales price (covering both cost and profit) of what taxpayer actually sells is allocated to mining (the depletable form of the mineral) and separated from the manufacturing and other specialized costs in proportion to the costs of mining. As applied to this case, it is the percentage of the gross sales price which the costs of mining and moving such dimension block from the quarry to the rim of the mine bears to the entire cost of producing the finished products sold to the public.

Since the first mineral product is rough quarry block at the quarry rim, the "gross income from mining" of the quarry blocks actually sold would be the

sales price received for the blocks in accordance with the regulations. There is no dispute between the parties as to this method with respect to the blocks sold.

The parties are in disagreement with respect to the method of allocating the income (including costs and profit) from the manufactured product between the block which it quarried or purchased and the manufacturing processes. The manufactured product represented from 91% to 97% of its total income. Taxpayer claims that its sales of rough quarry blocks establishes the representative market or field price of its manufactured marble as at the cut-off point at the rim of the quarry and, in the alternative, that if its sales at the cut-off point do not establish the representative market or field price, then the sales of quarry blocks by other Tennessee marble miners should be used.

It is defendant's contention that the sales of quarry block made by the taxpayer or the other miners were in such small quantities under the circumstances existing in this case that they are not truly representative of the value of the marble which taxpayer processed and sold in manufactured form and that the proportionate profits method under the regulations should be used. It is said that these small sales were of various colors and sizes of marble blocks which were marketable at premium prices because job specifications were set by architects for the kind of marble to be used, whether it be that of taxpayer or other miners; that this put taxpayer and the other miners in a monopolistic position and enabled them to sell blocks at premium prices to others who wished to supply the overall contract; that each of the Tennessee producers purchased some blocks from each other to meet orders they could not supply from their own quarry production; that there was no substantial market, at the price levels at which the select blocks were sold, for the larger part of their quarry production; that the blocks sold by taxpayer, as well as the other miners, were principally premium blocks, No. 1, in terms of size, soundness, shape and color. It is pointed out that if the sales prices of the quarry marble blocks are used to compute the gross income from all the marble mined, taxpayer's manufacturing operation will show losses in every year that is involved, except 1953, 1957 and 1959, and small profits only for each of these years.

A schedule was filed by the defendant showing how taxpayer allocated its net income as between its mining and manufacturing operations in accordance with the figures in its income tax returns:

| Year | Total Net Income Reported | Percentage Depletion Deduction Claimed | Total Net Income before Depletion Deduction | Net Income from Mining | Net Income from Manufacturing |
|------|---------|---------|---------|---------|---------|
| 1953 | 14,424.12 | 29,491.37 | 43,915.49 | 58,982.74 | ( 15,067.25) |
| 1954 | ( 9,773.25) | 108,992.49 | 99,214.24 | 424,823.58 | (325,609.34) |
| 1955 | ( 68,086.93) | 138,642.72 | 70,555.80 | 595,635.62 | (525,079.82) |
| 1956 | ( 10,164.57) | 167,675.61 | 157,511.54 | 725,571.36 | (568,059.82) |
| 1957 | 17,692.25 | 177,178.33 | 194,871.18 | 744,215.15 | (549,343.97) |
| 1958 | (205,607.22) | 153,961.99 | (51,645.23) | 585,406.96 | (637,049.19) |
| 1959 | 11,039.01 | 146,549.75 | 157,533.76 | 707,642.92 | (550,054.20) |
| 1960 | ( 78,809.35) | 55,087.92 | (23,721.43) | 216,845.01 | (193,123.98) |

It is to be observed that this schedule shows substantial net income from mining during each of the years involved and comparatively larger losses from manufacturing.

Another schedule was filed showing comparison of receipts of processed marble products and the total cost thereof to plaintiff, including manufacturing costs and the cost of marble at the claimed representative prices:

| Year (1) | Cost of Marble at Claimed Representative Price (i. e., Claimed Gross Income from Mining) (2) | Manufacturing Administrative and Sales Expense on Quarried Marble Per Returns (3) | Total Cost of Quarried Marble Exclusive of Transportation Costs (Col. 2+Col. 3) (4) | Net Receipts of Sales of Processed Quarried Marble (5) |
|---|---|---|---|---|
| 1953 | 588,255.56 | 622,979.59 | 1,211,235.15 | 1,267,584.49 |
| 1954 | 652,160.99 | 889,251.19 | 1,541,412.18 | 1,383,483.39 |
| 1955 | 569,757.81 | 889,349.61 | 1,459,307.42 | 1,434,651.80 |
| 1956 | 695,738.69 | 908,933.07 | 1,604,671.76 | 1,653,574.97 |
| 1957 | 692,992.90 | 959,957.43 | 1,652,950.33 | 1,820,664.60 |
| 1958 | 679,807.92 | 908,631.99 | 1,588,439.91 | 1,409,689.73 |
| 1959 | 582,171.37 | 849,012.65 | 1,431,184.02 | 1,344,845.04 |
| 1960 | 218,197.17 | 381,032.66 | 599,299.83 | 517,929.25 |

It is obvious from the foregoing figures that if taxpayer paid the claimed price to itself for the raw block which it then manufactured, its losses for income tax purposes would be substantial. This raises the question whether businessmen could actually pay such prices for their own block, such that substantial losses would occur from year to year in the manufacturing business and continue in business. It assumes that all marble quarried would have the same high quality of size, color, soundness etc., a fact which is not supported by the record. Defendant says that it is economically unrealistic to believe that such prices could be allocated to all the blocks, and that taxpayer could not continue in the manufacturing business.

This leads us to the question whether the price allocated by taxpayer for its raw blocks or the prices paid by taxpayer's competitors were representative market or field prices; or whether, on the facts, some other method of arriving at the price of the blocks is indicated.

The case of United States v. Henderson Clay Products, 324 F.2d 7 (C.A.5, 1963) dealt with this question. That case presented the problem of defining "gross income from mining" in determining depletion allowances for an integrated miner-manufacturer of ball clay processed into bricks. The first commercially marketable product of nonintegrated clay miners was shredded ball clay having a market price of $10.50 per ton. Taxpayer sold its finished brick for $8.75 a ton. The evidence and the finding of the lower court showed that the nationally marketed shredded ball clay, for which there was some market, and the taxpayer's clay were of like kind and grade for purposes of determining depletion allowances for integrated miner-manufacturer in ball clay. For the fiscal years 1951–54, the taxpayer used the gross income from its finished brick as the basis for its depletion allowance. The Commissioner challenged the returns and assessed deficiencies based on the proportionate profits method for de-

termining percentage depletion. The Court held that the use of the proportionate profits method in calculating the income was proper. The Court observed that:

"The competitive market approach is to be used only if there is a 'representative market or field price' of an essentially similar product. The Regulation does not allow the indiscriminate use of any price of a product of like kind and grade, but requires the price to be representative; 'representative' should be interpreted to qualify the entire phrase 'market or field price'."

\* \* \* \* \* \*

"In the light of this basic purpose, Regulation 39.23(m)–1(e) (3) must be seen as a constructive means of estimating that part of the integrated producer's gross income which is attributable to the operation of mining, i. e., the depletion of a capital resource. It is thus a means of *disintegrating* an integrated company back into separate mining and processing entities. The proper gross income is that which the hypothetical mining entity would realize upon selling its products to its processing alter-ego. The need for this constructive disintegration is emphasized by the strong desire to afford no unfair tax advantage to the integrated producer vis-a-vis the non-integrated miners and manufacturers. The representative price is then the competitive going price for the product, i. e., the price charged by the taxpayer's competitors.

"Clearly the Kentucky-Tennessee ball clay price of $10.50 per ton is not representative insofar as its use does not fulfill the statutory objective outlined above. This price in no way represents the depletion of the taxpayer's clay resources and in no way represents the price which a non-integrated brick manufacturer would pay for clay with which to make brick."

\* \* \* \* \* \*

"There is one final problem with the taxpayer's position. Henderson has suggested that it sells brick for $8.75

per ton instead of clay for $10.50 per ton because the research, advertising and marketing expenses involved in selling clay might well result in a lower net profit than that received from selling brick. If this is true, then it would be necessary for the taxpayer to compute *a hypothetical net income* corresponding to its proposed hypothetical gross income. Section 114(b) (4) (A) allows a depletion allowance only up to fifty per cent of the taxpayer's net income. Since fifteen per cent of $10.50 would obviously give a much higher allowance than fifteen per cent of $8.75 this, coupled with the lower net income which would have been received from the clay, might well have resulted in a depletion allowance in excess of the fifty per cent of net income permitted by the statute. Cf., Comment, 28 U.Chi.L.Rev. 121, 128–129 (1960). What method would be used to determine such a hypothetical net income is far from clear. In short, the taxpayer's position would involve a highly complex interweaving of hypothetical incomes. We cannot believe that Congress, in enacting uniform depletion rates which had, as one of their cardinal virtues, simplicity of operation, ever intended the application of these rates to become bogged down in such complexities.

"We hold, therefore, that this taxpayer must use the proportionate-profits method of computing depletion base, since that method comes closer to carrying out the intent of the depletion sections, as construed by the Supreme Court in United States v. Cannelton Sewer Pipe Co. than taking the 'representative market or field price' for clay 'of like kind and grade.' "

Our case is a stronger one than *Henderson Clay Products* for use of the proportionate profits method because of the variables in the marble blocks produced —size, shape, color, soundness, etc., whereas in the cited case the clay appeared to have a uniform quality and character. In the opinion of the Court the reasons assigned by the defendant,

why the price set by the taxpayer on the block that it mined and purchased from itself, and the prices charged by its competitors for the blocks which they mined and sold are not representative, are valid.

The following factors have a bearing on the question of whether the prices charged by the taxpayer for the mined dimension blocks are representative:

(1) Small percentage of block sales in comparison with the quantities used in its manufacturing process. (2) The monopolistic aspect of the purchase of marble fixed by the architect of the jobs on which the marble was used. The record shows that when the architect prescribed a certain kind of marble on a job such marble had to be used on that job, and if it wasn't the kind mined by the marble producer who was the successful bidder on the overall job, that such producer had to purchase same from some other marble miner. (3) There were several different grades of marble and taxpayer's theory assumed that it used the best grade which it quarried in its manufacturing process, in our opinion an unrealistic assumption. (4) Small sizes of marble going into the split-face ashlar, as well as in much of its manufactured dimension stone.

Taxpayer says that if the proportionate profits method is used to determine its gross income, such method assumes that the same rate of profit is made for each dollar of cost, when as a matter of fact, the dollar expended in the cost of mining earns considerably more than the dollar used in manufacturing; that if the taxpayer were to lower the bookkeeping price of the blocks that it sells to itself, the earnings of the mining dollar would be materially increased. But the greatest vice, in the opinion of the taxpayer, is that the proportionate profits method deprives it of the depletion value of the marble blocks.

The Commissioner gave taxpayer the deduction for percentage depletion at the rate of 5% for 1953 and 15% for the years thereafter on its gross income from the mining of its product in accordance with Section 114 of the Internal Revenue Code of 1939 and Section 613 of the Internal Revenue Code of 1954.

In the opinion of the Court, the small percentage of the sales of the dimension blocks in the raw state by taxpayer and its competitors in comparison with the quantity used in its plant, the monopolistic aspect of the purchase of the marble fixed by the architect of the job on which the marble was used, the different grades mined are used in the manufacturing process, and the large quantities of split-face ashlar that were produced after 1955, when considered in relation to the circumstances of taxpayer's mining and manufacturing business, show that the Commissioner was correct in using the proportionate profits method in computing taxpayer's gross income from mining for purposes of determining the deduction for percentage depletion on such products. United States v. Henderson Clay Products Company, supra. Henderson Clay Products v. United States, D.C., 252 F.Supp. 1013.

Judgment will be entered in conformity with the views herein stated.