**UNITED STATES of America,
Appellant,**

v.

**PORTLAND CEMENT COMPANY OF UTAH, a Utah corporation,
Appellee.**

**No. 6591.**

United States Court of Appeals
Tenth Circuit.

July 27, 1961.

Abbott M. Sellers, Acting Asst. Atty. Gen., Louis F. Oberdorfer, Asst. Atty. Gen., and Lee A. Jackson, Melva M. Graney and James P. Turner, Attys., Dept. of Justice, Washington, D. C., for appellant.

Glen E. Fuller and Jack R. Decker, Salt Lake City, Utah, for appellee.

Before MURRAH, Chief Judge, PICKETT, Circuit Judge, and SAVAGE, District Judge.

SAVAGE, District Judge.

In this income tax refund case the United States appeals from a judgment in favor of the taxpayer for taxes paid under protest for the years 1954 through 1956. The controversy arose over the computation of the statutory depletion allowance to the taxpayer in the mining and processing of cement rock into cement. The Internal Revenue Code of 1954, § 613, 26 U.S.C.A. § 613, which was in effect during the tax years in question, provides that in the case of mines there shall be allowed as a deduction in computing taxable income a reasonable allowance for depletion which shall be a percentage of the gross income from mining. The schedule of percentage depletion rates provides for a 15% depletion allowance for "all other minerals (including but not limited to) * * * calcium carbonates * * * limestone." The term "mining" includes "not merely the extraction of the ores or minerals from the ground but also the ordinary treatment processes normally applied by mine owners or operators in order to obtain the commercially marketable mineral product or products * * *."

The findings were that the taxpayer was engaged in the mining of an argillaceous limestone from its own quarry located in a canyon twelve miles east of its processing plant in Salt Lake City, Utah. It was mining a kind of limestone known in the trade as cement rock, which was desirable for making cement but had value for no other purpose. Cement rock may be processed into finished cement without the necessity of blending and mixing many isolated products, which is required in the manufacture of cement from ordinary limestone. The ingredients found in cement rock are mixed in a solid solution in such a manner as to constitute an ideal mineral in its natural state for producing cement.

In processing its cement rock into finished cement, the taxpayer resorted to procedures normally applied by other

similar mine owners and operators. It blasted the rock out of a mountainous quarry face and reduced the size by secondary blasting of large boulders which were obtained. The rock was then crushed in a gyratory crusher to sizes two to four inches rough diameter plus "fines" ranging in size down to splinters. The usable material was then transported to the plant in Salt Lake City where it was further crushed to three-fourths inch rough diameter size. It was then ground in ball mills to a fineness of 90% in volume, passed through a 200 mesh sieve and water was added forming a "slurry," which is a very fine mud. The slurry was placed in tanks where it was mixed and made uniform and then fed into rotary kilns and sintered. The resulting clinkers were cooled and later ground into cement, which was stored in silos for future sale.

The taxpayer has never sold any of the crushed cement rock it produced nor made any use of it other than to make cement. "Fines" produced at the quarry were disposed of as waste material for lack of any market. Cement rock is not suitable for use as road base material. When a highway was cut through the taxpayer's deposit the cement rock was pushed aside and other materials hauled in for the road bed.

The problem presented is whether depletable gross income from mining is that realized from the sale of finished cement, as contended by the taxpayer and decided by the trial court, or whether it is limited to the constructive income from crushed cement rock as contended by the government. The government asserts that the taxpayer is an integrated miner-manufacturer; that its mining operations terminate when the mineral is converted into crushed limestone, and that the subsequent processing into finished cement is a manufacturing operation.

This argument would be unassailable except for the statutory definition of "mining" as including "ordinary treatment processes normally applied by mine owners or operators in order to obtain the commercially marketable mineral product or products." This definition may under the facts of a particular case take us well beyond the ordinary concept of mining operations.

The cement rock mined by the taxpayer unquestionably was not salable at the market at any stage of processing until it became finished cement. But the government points out that only the treatment processes which are normally applied by miners are encompassed within mining and that "mining" is limited to the basic marketable product of each branch of the mining industry; that mining ends when the mineral reaches the point at which it may by industry standards be sold, and that any unusual or abnormal processing resorted to by the taxpayer would not be embraced in the mining operations.

The taxpayer urges that, because the location of the mineral deposit is such a vital factor in determining its value, only the local market may be relied upon to reflect the true value of the mineral. Taxpayer would look only to the availability of a local market for its products in deciding at what stage of processing a commercially marketable product had been obtained. This was the test applied by the trial court, which found that the taxpayer produced no product from its cement rock deposit which was commercially marketable, nor could have, prior to its conversion into finished cement. The court further found that the location of the deposit in a narrow canyon precluded the sale for road and construction purposes.[1] Evidence offered by the government in support of its theory as to the first

1. Finding 10 was: "There is not a product which plaintiff produced, or which it might have produced, from its cement rock deposit which was or is readily marketable or commercially marketable, prior to the production of finished cement. The location of the deposit is in a narrow canyon where considerations of accessibility to transportation, or possible markets, available area for storage of materials and location of necessary machinery, equipment and operations involving blasting and crushing, completely preclude the sale of said material for road

marketable product of the mining industry of which taxpayer is a part was excluded.

If the statutory provision for including "ordinary treatment processes normally applied by mine owners or operators" left the issue in doubt, it was set at rest by the Supreme Court in United States v. Cannelton Sewer Pipe Company, 364 U.S. 76, 80 S.Ct. 1581, 1587, 4 L.Ed.2d 1581, 1587, decided shortly after judgment was entered in this case. There the taxpayer mined fire clay and shale at Cannelton, Indiana, which was processed into sewer pipe and other vitrified articles. Because it could not profitably sell its raw fire clay and shale, taxpayer contended that its percentage depletion was properly based upon its gross sales of finished products. The government contended that an industry wide test should be applied. The findings were that during 1951, the tax year in question, there were substantial sales of raw fire clay and shale in Indiana. In Kentucky, across the river from taxpayer's plant, fire clay and shale of the same grade were mined and sold. Since 1957, the taxpayer had secured all of its mineral requirements from this source by lease under which the lessor mined and delivered the raw material. In holding that fire clay and shale were "commercially marketable" in their raw state, the court rejected the argument that such phrase implied marketability at a profit. "It would be strange, indeed," said the Court, "to ascribe to the Congress an intent to permit each miner to adopt processes peculiar to his individual operation."

█ Proceeding from the sound premise that an industry-wide test must be applied, the government next argues that the taxpayer is a part of the limestone mining industry and that the basic marketable product of such industry is crushed limestone. While conceding that cement rock is a species of limestone, the taxpayer asserts that cement rock is a

and construction purposes or any other use other than the production of cement."

mineral in its own right and is recognized as such by statute, by treasury regulations and by court decisions.

The statutory list of "all other minerals" to be accorded a 15% depletion allowance included "calcium carbonates" and "limestone." Cement rock is not listed by that name but it is one of the calcium carbonates as well as a type of limestone. Treasury Regulations 118, § 39.23(m)–5(b), significantly provides:

"For the purpose of this section, the minerals indicated below shall have the following meanings:

"Calcium carbonate * * * Miscellaneous limestones and other calcium carbonate rocks * * * such as cement rock and limestone used or sold for use in soil treatment. This classification does not include rocks or minerals used or sold for use as ballast, road making, concrete aggregates or other purposes for which chemical composition is not a major requirement."

In Dragon Cement Company v. United States, 1 Cir., 244 F.2d 513, 517, the controversy, as in our case, was over the depletion allowance to be granted a taxpayer who quarried cement rock for processing into cement. After tracing the legislative history of depletion laws, the court observed:

"By § 319 of the Revenue Act of 1951 (65 Stat. 497), the Congress amended § 114(b) (4) (A) of the Internal Revenue Code so as to extend the availability of percentage depletion for the first time to 'calcium carbonates,' which includes deposits of cement rock, the natural resource involved in the case at bar."

We agree with the taxpayer that its cement rock deposit is more accurately classified for our purposes as a "calcium carbonate." While cement rock may properly be characterized as limestone, there are many grades of limestone and many different limestone industries.[2]

2. See, C. I. R. v. Iowa Limestone Co., 8 Cir., 269 F.2d 398, 404:
"We do not think that the depletion statute contemplates that all types of

■ We conclude that a decision of this case requires a finding based upon a consideration of relevant evidence as to "the ordinary treatment processes normally applied by" cement rock "miners or operators in order to obtain the commercially marketable mineral product or products."

The ultimate disposition of this litigation will require further analysis and application of the Supreme Court's Cannelton case. The government contends that Cannelton holds that the term "ordinary treatment processes" refers to mining processes, and the dependent clause, "normally applied * * * to obtain the commercially marketable mineral product," permits only the inclusion of processes which are necessary to make the mineral suitable for commercial or industrial use. It asserts that, even if cement rock is treated as a separate branch of industry in which every miner is also a manufacturer of cement, the ordinary treatment processes included in mining would terminate with the crushing operation for at that point the mineral can be shipped to a manufacturer for processing. Cannelton, as the government reads it, requires a conclusion that, even if there be no market for crushed cement rock because all cement rock miners are also cement manufacturers, for depletion purposes the taxpayer manufacturer will be considered as purchasing from himself as a miner the raw materials used in making cement.

The taxpayer insists that such an interpretation of Cannelton is not warranted by the facts because there substantial quantities of the crude mineral products mined in the area were sold in the raw state. In addition, the taxpayer relies on our decision in United States v. Sapulpa Brick & Tile Corporation, 10 Cir., 239 F.2d 694, where we held, upon findings that only a negligible quantity of the brick and tile clay was or could be sold, that the first commercially marketable products were burnt brick and tile. Our decision followed that of the Fifth Circuit in United States v. Cherokee Brick & Tile Co., 218 F.2d 424, and the Fourth Circuit in Townsend v. Hitchcock Corporation, 232 F.2d 444.[3] These decisions were not overruled by the Supreme Court in Cannelton but the government argues they are no longer "authoritative." The Court thought "it is sufficient to say that on their facts they are all distinguishable."

At a new trial and after making essential findings of fact, the trial court will be afforded an opportunity for the first time to decide this case in the light of the Supreme Court's Cannelton decision.

Reversed and remanded.

---

limestone be considered the same mineral. This was apparently the Tax Court's thought when it stated: 'Limestone is divided commercially into three large fields, i. e., chemical and manufacturing industries, building industries, and agriculture. * * *'"

3. See also, Dragon Cement Company, 1 Cir., 244 F.2d 513; United States v. Merry Bros. Brick & Tile Co., 5 Cir., 242 F.2d 708.