UNITED STATES of America, Appellant,

v.

PORTLAND CEMENT COMPANY OF UTAH, a Utah corporation, Appellee.
PORTLAND CEMENT COMPANY OF UTAH, a Utah corporation, Appellant,

v.

UNITED STATES of America, Appellee.

Nos. 7677, 7678.

United States Court of Appeals Tenth Circuit.

Nov. 25, 1964.

Melva M. Graney, Washington, D. C. (John B. Jones, Jr., Acting Asst. Atty. Gen., Lee A. Jackson, and Jonathan S. Cohen, Washington, D. C., on the brief), for appellant in No. 7677 and appellee in No. 7678.

Glen E. Fuller, Salt Lake City, Utah (Jack R. Decker, Salt Lake City, Utah, on the brief), for appellee in No. 7677 and appellant in No. 7678.

Before BREITENSTEIN, HILL and SETH, Circuit Judges.

BREITENSTEIN, Circuit Judge.

This income tax refund case is here for the third time.[1] The controversy concerns the depletion allowance to which Portland Cement Company of Utah, the taxpayer, is entitled because of its production of cement rock. The tax years in dispute are 1954, 1955, and 1956.

Taxpayer is an integrated miner-manufacturer. It mines cement rock at its own quarry in Parley's Canyon, Utah, and there crushes the rock to shipping size.[2] The rock is then transported 12 miles to taxpayer's plant in Salt Lake City where it undergoes secondary crushing and is manufactured into cement. The trial court held that value for the

purpose of the depletion allowance should be determined after the secondary crushing at the plant. The government contends that such value must be determined after the primary crushing at the quarry.

Percentage depletion allowances are governed by § 613 of the Internal Revenue Code of 1954. Subsection (a) provides that the allowance shall be a percentage of the "gross income from the property." Subsection (b) (6) authorizes a 15% allowance for various minerals including calcium carbonates. Cement rock is a calcium carbonate.[3] Subsection (c) (1) states that "gross income from the property" means, except for oil or gas, "gross income from mining." Before the amendment of 1960, 74 Stat. 290, 292, mining was defined by subsection (c) (2) to include not only the extraction of the ores but also "the ordinary treatment processes normally applied by mine owners or operators in order to obtain the commercially marketable mineral product or products." The term "ordinary treatment processes" was defined by subsection (c) (4) (C) for minerals which are customarily sold in the form of a crude mineral product and included "sorting, concentrating, and sintering to bring to shipping grade and form, and loading for shipment." [4]

In the first trial the district court held that the depletion allowance should be based on the value of the finished cement because that was the first commercially marketable product obtained from the cement rock deposit. Thereafter the Supreme Court decided United States v. Cannelton Sewer Pipe Co., 364 U.S. 76, 80 S.Ct. 1581, 4 L.Ed.2d 1581, which related to an integrated miner-manufac-

1. See United States v. Portland Cement Co. of Utah, 10 Cir., 293 F.2d 826; 315 F.2d 169.

2. The topography of the quarry site precludes other operations at that location.

3. Treas.Reg. 118, § 39.23(m)–5(b).

4. We are not concerned with subsection (c) (4) (F) which was added in 1960 and provides a pre-kiln cut-off point for cement producing minerals. Nor are we concerned with the Act of September 14,

1960, 74 Stat. 1017, 1018, which gave cement producers 60 days to elect that cut-off point for taxable years prior to 1961. See Riddell v. Monolith Portland Cement Co., 371 U.S. 537, 538, n. 1, 83 S.Ct. 378, 9 L.Ed.2d 492, rehearing denied 372 U.S. 932, 83 S.Ct. 871, 9 L.Ed.2d 737; and United States v. Monolith Portland Midwest Co., 9 Cir., 336 F.2d 402. Taxpayer did not elect to accept the pre-kiln cut-off point.

turer of burnt clay products. The Supreme Court held that the depletion allowance is "based on the constructive income from the raw mineral product, if marketable in that form, and not on the value of the finished articles" ; [5] that the cut-off point for gross income from mining stops "where the ordinary miner shipped the product of his mine" ; [6] and that integrated mining-manufacturing operations must be "treated as if the operator were selling the mineral * * * to himself * * *." [7] On the authority of Cannelton we reversed and remanded for a new trial.[8]

On the second trial the district court renewed its earlier holding that bulk cement was the first commercially marketable product and held additionally that the operations of the taxpayer included only processes normally applicable to obtain such product from the cement rock. Thereafter the Supreme Court decided Riddell v. Monolith Portland Cement Co., 371 U.S. 537, 83 S.Ct. 378, rehearing denied 372 U.S. 932, 83 S.Ct. 871, which related to an integrated cement miner-manufacturer. The Court said that the basis for depletion was "constructive income from crushed limestone, rather than from finished cement." [9] We reversed on the authority of Riddell and held that depletion is limited "to the constructive income from the limestone when it reached the crushed stage." [10]

We are concerned with two processes—primary crushing at the quarry and secondary crushing at the plant. The question is whether one or both are normally applied to obtain a commercially marketable product. The concept of commercial marketability is based on sale of a product.[11] In our first opinion in this case we said that cement rock mined by the taxpayer "was not salable at the market at any stage of processing until it became finished cement." [12] The government does not contend that cement rock is sold on the market.

· In Riddell the Supreme Court said that Cannelton held that in the case of an integrated miner-manufacturer the cut-off was "at the point where the mineral first became suitable for industrial use or consumption." [13] This rule was applied in United States v. Longhorn Portland Cement Co., 5 Cir., 328 F.2d 491, a cement rock case which differs from the instant case because there the cement plant was located at the quarry site. Longhorn is not helpful here because the issue it determined was whether "sintering" was an ordinary treatment process.

Taxpayer argues that suitability for industrial use occurs after all crushing, both primary and secondary. The government says that the cut-off point is determined by shippability. The close question presented has been answered by the Supreme Court. In Cannelton it held that gross income from mining stopped "where the ordinary miner shipped the product of his mine." [14] Riddell holds that mining terminates at the "crushed limestone stage." [15]

In our case the rock is shipped after primary crushing. A nonintegrated miner would have no occasion to perform the secondary crushing which is done by the taxpayer as a preparatory step in its manufacturing process. Indeed, the rec-

5. 364 U.S. 76, at 86, 80 S.Ct. at 1586.

6. Id. at 87, 80 S.Ct. at 1587.

7. Id. at 89, 80 S.Ct. at 1588.

8. 293 F.2d 826.

9. 371 U.S. 537, at 539, 83 S.Ct. 378, at 379.

10. 315 F.2d 169, at 171.

11. For example, in Riddell the Supreme Court pointed out that limestone was sold in large amounts in crushed form. See 371 U.S. 537, 539, n. 2, 83 S.Ct. 378.

12. 293 F.2d 826, 828.

13. 371 U.S. 537, 538, 83 S.Ct. 378, 379.

14. 364 U.S. 76, at 87, 80 S.Ct. 1581, at 1587.

15. 371 U.S. 537, at 539, 83 S.Ct. 378.

ord shows that limestone of the sizes obtained by primary crushing sells for a higher price, because of ease in handling, than does limestone of the sizes obtained by secondary crushing. From the position of a miner selling his product optimum marketability occurs after primary crushing because of the higher price.

The taxpayer points out that § 613(c)(2) defines mining to include limited transportation from the place of extraction to the plant "in which the ordinary treatment processes are applied." This argument brings us back to what is an ordinary treatment process. The applicable subsection (c)(4) definition of this term mentions several processes and includes "loading for shipment." In our case shipment occurs before secondary crushing.

■ We conclude that Cannelton and Riddell require the holding that mining terminates at the end of primary crushing. This means that the depletion allowance applies to the value of the product at that cut-off point.

The next question relates to the method of computing taxpayer's gross income from mining. In the absence of sales this must be determined constructively. The government contends, and the trial court held, that the proportionate profits formula embodied in the 1939 Treasury Regulations [16] is appropriate and applicable. Taxpayer says that the formula is not applicable and that the court erred in rejecting evidence showing its unfairness and the applicability of an alternative method which is claimed to reflect more appropriately taxpayer's gross income from mining.

The proportionate profits method is one under which profits from the product actually sold are allocated to mining according to the proportion of mining costs to total costs. The depletion allow-

ance is then based on the allocation to mining.

Taxpayer attacks the formula on the ground that it prejudices the operator with low mining costs. The prejudice occurs because high mining costs, in relation to total costs, increase the percentage of profit attributable to mining and thus increase the depletion base. Taxpayer insists that its mining costs are low because of its extraordinary cement rock deposit.

Again we have a puzzling problem. Cannelton says that depletion is "an allowance for the exhaustion of capital assets" and is not a subsidy to "the high-cost mine operator." [17] Dissatisfaction with the 1939 formula is indicated by the proposed, but as yet unadopted, regulation under the 1954 Code which relates to the problem.[18] We are not impressed with the government's argument that Congress by the rejection of certain amendments to, and the subsequent passage of, the Revenue Act of 1942 [19] approved the proportionate profits method of computing the depletion base in a case such as the one before us. Those actions preceded the Cannelton decision. Cannelton approved the regulations only to the extent that they concerned the problem there presented.

■ The government also points out that the 1939 regulation provides that a method other than proportionate profits may be used if the taxpayer establishes to the satisfaction of the Commissioner that such different method "clearly reflects the gross income from the property." [20] The argument is that no other method may be used without antecedent approval by the Commissioner. We are not so persuaded. Since this case started we have had two pertinent decisions by the Supreme Court and three appeals to the Court of Appeals. In the circumstances the courts should determine the

16. Treas.Reg. 118, § 39.23(m)–1(e) (3).

17. 364 U.S. 76, at 86, 80 S.Ct. 1581, at 1587.

18. See Proposed Treas.Reg. § 1.613–3(b) (3) iii, 21 Fed.Reg. 8439, 8450 (1956).

19. 56 Stat. 798.

20. Treas.Reg. 118, § 39.23(m)–1(e) (3).

proper method of arriving at constructive value.

■ The trial court's rejection of the evidence offered by the taxpayer precluded the taxpayer from presenting its contentions that the proportionate profits method is unfair and that another method more clearly reflects its gross income from mining. In our opinion the evidence should be received. On retrial the court should determine the validity of the proportionate profits method and, if it is held invalid, the method which should be applied to fix the depletion base.

The final question relates to the taxing of costs. After the second remand the government served notice under Rule 30(a), F.R.Civ.P., of the taking of a series of oral depositions in eastern states. The notice does not appear in the record. The taxpayer moved that the taking of the depositions be conditioned upon the assessment of its costs in connection therewith if it prevailed in the case. The trial court made no order on the motion. The depositions were taken; and, after judgment in its favor, the taxpayer moved to assess as costs against the government the travel expense of its lawyers and consultants in attending the taking of the depositions and the expenses of obtaining copies of the depositions. The court gave judgment for $5,611.45—the total amount claimed.[21]

■ Costs are imposed against the United States only to the extent permitted by law.[22] Because this case is brought under 28 U.S.C. § 1346(a) the applicable statute is 28 U.S.C. § 2412(b) which authorizes taxation against the United States of costs "actually incurred for witnesses and fees paid to the clerk." The presently contested items do not come within that authorization.

■■ Taxpayer says that it is entitled to the costs under Rule 30(b) and relies on North Atl. & Gulf S. S. Co., Inc. v. United States, 2 Cir., 209 F.2d 487. That case did not arise under § 1346(a) and was decided on the basis of a local rule. Here we have no local rule and the taxpayer did not obtain a conditioning order before incurring the expenses which it seeks to tax as costs.[23] Its off-the-record explanation of why it did not obtain such order does not concern us. As we read Rule 30(b) the protective orders there mentioned must precede the taking of the depositions. In our opinion the deposition costs were improperly assessed against the United States.

The judgment is reversed in both No. 7677 and No. 7678 and the case is remanded for further proceedings in harmony with the views expressed in this opinion. Each party shall bear its own costs on these appeals.

---

21. This included $44.00 for the trial attendance of one witness. We express no opinion on the propriety of this item.

22. Rule 54(d), F.R.Civ.P.; 28 U.S.C. § 2412(a). See also Reconstruction Fin. Corp. v. J. G. Menihan Corp., 312 U.S. 81, 83, 61 S.Ct. 485, 85 L.Ed. 595;

United States v. Worley, 281 U.S. 339, 344, 50 S.Ct. 291, 74 L.Ed. 887; and United States v. Chemical Foundation, 272 U.S. 1, 20, 47 S.Ct. 1, 71 L.Ed. 131.

23. Cf. Euler v. Waller, 10 Cir., 295 F.2d 765, 767.