**UNITED STATES of America,**
**Appellant,**

v.

**PORTLAND CEMENT COMPANY**
**OF UTAH, Appellee.**

**No. 8886.**

United States Court of Appeals
Tenth Circuit.

May 16, 1967.

Rehearing Denied June 26, 1967.

Robert Livingston, Washington, D. C. (Mitchell Rogovin, Asst. Atty. Gen., Lee A. Jackson and Melva M. Graney, Attys., Department of Justice, on the brief), for appellant.

Glen E. Fuller, Salt Lake City, Utah (Jack R. Decker, Salt Lake City, Utah, on the brief), for appellee.

Before LEWIS, BREITENSTEIN and HICKEY, Circuit Judges.

BREITENSTEIN, Circuit Judge.

We have again the problem of how to determine, for the purpose of fixing the depletion allowance granted by federal income tax statutes, the income from the mining of a unique mineral for which no market exists and which is first salable commercially as a finished product, cement. In the absence of sales of the mineral the gross income from mining must be determined constructively. The question is how to do this. The trial court adopted the substitute-materials method of the taxpayer and rejected the proportionate-profits method of the government. We must decide between the two.

The dispute concerns the taxpayer's claims to tax refunds for the years 1954, 1955, and 1956. It is before us for the fourth time.[1] The taxpayer, an integrated miner-manufacturer, mines cement rock at its own quarry in Parley's Canyon, Utah. The cement rock is put through the primary crushing stage at the quarry. It is then hauled 12–13 miles to the taxpayer's plant in Salt Lake City where it is crushed further and made into cement. In our first opinion, we disapproved the claim that the depletion could be based on the finished product.[2] In our second opinion we held that depletion is limited "to the constructive income from the limestone when it

---

1. See United States v. Portland Cement Company of Utah, 10 Cir., 293 F.2d 826, 315 F.2d 169, and 338 F.2d 798.

2. 293 F.2d 826, 830.

reached the crushed stage." [3] Our third decision was that mining ended with primary crushing and that the income from mining must be determined at that point.[4] We remanded the case for determination of "the validity of the proportionate profits method and, if it is held invalid, the method which should be applied to fix the depletion base." [5]

The trial court took evidence bearing on the applicability and effect of the two proposed methods in arriving at taxpayer's constructive income from mining. It held that the substitute-materials method "more accurately and fairly reflects the value at the crushed rock stage than any other method that has been suggested to this Court." On this basis, the court fixed the value per ton for each year at $3.70 and, to arrive at the depletion base, multiplied the annual tonnage by this figure. The 15% depletion allowance was applied to the sums so determined. This resulted in findings and judgment that refunds of $11,785, $18,300, and $12,056 were due for the years 1954, 1955, and 1956 respectively. No findings were made as to the income from mining under the proportionate-profits method.[6]

Section 611(a) of the Internal Revenue Code of 1954, 26 U.S.C. § 611(a), allows a deduction from taxable income of depletion of natural deposits "according to the peculiar conditions in each case." We are concerned with calcium carbonate for which § 613(b) (6) allows a depletion of 15% of the "gross income from the property." The Treasury Regulations [7] implementing the statute have long prescribed methods of making a constructive computation of gross income from mining. The first is the use of representative market price; but here it is conclusively established that there was no such price. Under the second, or proportionate-profits method, the sale price of the product actually sold by the taxpayer (here, the sale price of cement) is allocated to mining according to the ratio that the costs of mining (here, the costs up through primary crushing) bear to total costs (here, the cost of cement). This method assumes that each cost produces a proportionate part of the profit.

The taxpayer's substitute-materials method requires more explanation. Portland cement is made of a mixture of calcium carbonate, aluminum silicate, other silicates, and iron. Cement rock is a rare material which contains within itself all the necessary constituents of a cement "mix" in approximately the correct proportions and without excessive impurities.[8] Cement rock has no use

3. 315 F.2d 169, 171.

4. 338 F.2d 798, 802.

5. 338 F.2d at 803.

6. It would be substantially less. Government exhibits fixed the gross income from mining for the three years at $130,807, $117,705, and $129,970. The court found the "value of tonnage produced" to be $256,410, $270,618, and $317,715 respectively.

7. Treas.Reg. 118, § 39.23(m)–1(e) (3) (1939 Code) says, so far as pertinent, that "gross income from the property" means: "If there is no such representative market or field price (as of the date of sale) then there shall be used in lieu thereof the representative market or field price of the first marketable product resulting from any process or processes (or, if the product in its crude mineral state is merely transported, the price for which sold) minus the costs and proportionate profits attributable to the transportation (other than transportation treated, for the taxable year, as mining) and the processes beyond the ordinary treatment processes. If the taxpayer establishes to the satisfaction of the Commissioner that another method of computation, other than the computation of profits proportionate to costs, clearly reflects the gross income from the property, then such gross income shall be computed by the use of such other method." In our third decision, 338 F.2d 798, 802–803, we rejected the argument that antecedent approval of the Commissioner was required as a condition precedent to the use of a method other than proportionate-profits because of the unusual circumstances surrounding this case.

8. In the use of cement rock some variations of the mix are needed to meet the specifications peculiar to different types of cement.

other than for making portland cement. The taxpayer's evidence established the prices in the Salt Lake City area of a group of available materials "which could have been blended together to produce a mix to substitute for the cement rock." The figures included the transportation costs "less the taxpayer's cost of transporting its own rock from its quarry to its plant." The substitute-materials method is based on the hypothesis that the taxpayer might have reconstructed the material in its cement rock by paying for the delivery to its plant, and use, of each component of cement rock. This amounts to the replacement of the cement rock by the components thereof and is in effect a reconstruction cost. The trial court adopted the theory of the taxpayer and found that its mineral product "has a value of $3.70 per ton after primary crushing." Thus, the trial court arrived at a theoretical value of the product mined rather than the gross income from mining.

In Anderson v. Helvering, 310 U.S. 404, 408, 60 S.Ct. 952, 954, 84 L.Ed. 1277, the Supreme Court said that a deduction for depletion is "permitted as an act of grace and is intended as compensation for the capital assets consumed in the production of income through the severance of the minerals." The statute says, § 611(a), that a "reasonable allowance" shall be made "according to the peculiar conditions in each case  *  *  * under regulations prescribed by the Secretary  *  *  *." The decision in

Douglas v. Commissioner of Internal Revenue, 322 U.S. 275, 281, 64 S.Ct. 988, 992, 88 L.Ed. 1271, points out that because Congress "obviously could not foresee the multifarious circumstances which would involve questions of depletion, it delegated to the Commissioner the duty of making the regulations." Here we are concerned with a regulation of more than 25 years standing.[9] It has been before the courts a number of times[10] without question of its underlying validity being raised. The taxpayer has the burden of showing both that the proportionate-profits method of the regulations is unreasonable and that its substitute-materials method is reasonable.

The briefs of the parties dwell at length on the mysteries of accounting. We prefer to direct our attention to the statute. Section 613(a) says that "the allowance for depletion  *  *  * shall be the percentage [here 15%]  *  *  * of the gross income from the property  *  *  *." The controlling factor is gross income.[11]

The taxpayer attacks the proportionate-profits method on several grounds. It rightly asserts that such method proceeds on the premise that each dollar of cost produces a proportionate amount of profit. Eminent accountants are quoted to establish the fallacy of such reasoning. The government counters with statements of other writers on accounting. Our view is that all costs have to be recovered before there is a profit. If the inclusion of unproductive costs so

9. In our third decision in this case, 338 F.2d 798, 802, fn. 18, we mentioned Proposed Treas.Reg. § 1.613–3(b) (3) iii, 21 Fed.Reg. 8439, 8450 (1956). This was subsequently withdrawn. The presently proposed regulation, Proposed Treas.Reg. § 1.613–3(d), 31 Fed.Reg. 9508, is substantially similar to the regulation set out in footnote 7 supra. It provides for the proportionate-profits method and contains no authorization for anything resembling the taxpayer's substitute-materials method.

10. See Standard Lime and Cement Co. v. United States, 329 F.2d 939, 165 Ct.Cl. 180; Riddell v. Monolith Cement Co., 371 U.S. 537, 83 S.Ct. 378, 9 L.Ed.2d

492; Whitehall Cement Manufacturing Co. v. United States, 3 Cir., 369 F.2d 468.

11. We realize that in United States v. Cannelton Sewer Pipe Co., 364 U.S. 76, 86, 80 S.Ct. 1581, 4 L.Ed.2d 1581, and in our third decision in this case, 338 F.2d 798, 802, reference is made to "value" of the product. This loose use of the term "value" cannot change the statute. Additionally the Court said in Cannelton, 364 U.S. 76, 86, 80 S.Ct. 1581, 1586, that the legislative history shows that "Congress intended to grant miners a depletion allowance based on the constructive income from the raw mineral product  *  *  *"

distorts the equation that the application of the formula does not in fact clearly reflect the gross income from the property, they may be excluded. In the case at bar the taxpayer makes no showing of unproductive costs.

We will agree with the taxpayer that the government method may penalize the low-cost miner because high mining costs, in relation to total costs, increase the percentage of profit attributable to mining and thus increase the depletion base. In brief and argument the taxpayer asserts that it is a low-cost operator and, hence, prejudiced by the formula. The difficulty is that the record contains no proof to this effect.[12] The taxpayer has failed to convince us that it is a low-cost operator which is penalized for that reason by the proportionate-profits method.

Another objection of the taxpayer to the government formula is that it uses book costs to arrive at value. Certainly such costs represent and record real expenditures. They are taken from the taxpayer's ledgers. No showing is made of any instance in which they might be incorrect. The government does not try to "value" the product on the basis of book costs. Rather, it seeks to arrive at a constructive income from mining by using the taxpayer's records.

Although the depletion allowance is intended to compensate for the loss of a capital asset,[13] that allowance "bears little relationship to the capital investment, and the taxpayer is not limited to a recoupment of his original investment."[14] The argument that the proportionate-profits method is unfair because it does not take into account the value of the deposit was rejected in Whitehall Cement Manufacturing Co. v. United States, 3 Cir., 369 F.2d 468, 472–473.[15] We also reject this argument. The value of a deposit is not the measure of income therefrom.

The taxpayer insists that the peculiar conditions of its operation make the substitute-materials method a reasonable procedure for the establishment of the depletion base. The replacement of the function of cement rock by the use of substitute materials from which cement can be made furnishes a basis for determining the value of cement rock. The value of a product is not necessarily the same as the gross income from the production of that product. For there to be income the product must be converted to money or its equivalent. A synthetic determination of the aggregate value of the components of cement rock is not the equivalent to the gross income received from the mining of that rock.

The trial court in its findings on the depletion computation does not characterize as income from mining the amount arrived at by multiplying the tonnage and the value per ton established by the substitute-materials meth-

12. There is evidence that the use of taxpayer's product results in a reduced sintering cost. This is immaterial for two reasons. First, sintering occurs after the cut-off point for fixing the depletion base. Second, reduction in processing costs creates a higher percentage for mining costs and, hence, a higher depletion base. It should be noted that the taxpayer did not elect to accept the pre-kiln cut-off point permitted by a 1960 statute. See 338 F.2d 798, 800, fn. 4.

13. See Kirby Petroleum Co. v. Commissioner of Internal Revenue, 326 U.S. 599, 602–603, 66 S.Ct. 409, 90 L.Ed. 343.

14. Commissioner of Internal Revenue v. Southwest Exploration Co., 350 U.S. 308, 312, 76 S.Ct. 395, 398, 100 L.Ed. 347.

15. Although the Whitehall case related to cement rock, it is not analogous to the situation before us. In Whitehall, the taxpayer elected to accept the pre-kiln cut-off point. Here the taxpayer did not so elect. In Whitehall, the taxpayer's alternative to the proportionate-profits method was a formula whereby the gross income from cement was determined on the ratio of the weight of cement rock to the weight of all other ingredients. The gross income from mining was reached by application of the ratio of pre-kiln costs with total direct costs to the gross income from cement rock. Whitehall did not consider the substitute-materials method.

od. Instead it finds an amount described as "Value of Tonnage Produced" and applies the depletion percentage thereto. In our opinion, the statute does not permit such procedure. We decline to equate value of product with gross income from mining in the circumstances here presented.

It may be that in some situations a constructive determination of gross income can be made by the use of the substitute-materials method. All we now say is that on the record presented and the peculiar conditions here pertaining, the proportionate-profits method results in a reasonable depletion allowance and that the substitute-materials method does not reflect the gross income from the property.

The judgment is reversed and the case is remanded for determination of the refunds, if any, to which the taxpayer is entitled in accordance with the views expressed in this opinion.