THE NORTH CAROLINA GRANITE CORPORATION, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Dockets Nos. 577–69 and 3767–69.    Filed September 13, 1971.

*Ira S. Siegler*, for the petitioner.
*James D. Burroughs*, for the respondent.

IRWIN, *Judge:* The Commissioner determined deficiencies in petitioner's income tax as follows:

| TYE Dec. 31— | Deficiency | TYE Dec. 31— | Deficiency |
|---|---|---|---|
| 1959 | $27,745.69 | 1963 | $40,487.24 |
| 1960 | 37,004.32 | 1964 | 35,088.19 |
| 1961 | 27,719.72 | 1965 | 16,520.41 |
| 1962 | 36,763.90 | 1967 | 29,750.72 |

The deficiencies relate to petitioner's method of computing percentage depletion under section 613 of the Internal Revenue Code of 1954 [1] for granite that it sold during the years at issue. The specific questions in controversy are whether petitioner is to be required to

---

[1] All statutory references are to the Internal Revenue Code of 1954, as amended, unless otherwise indicated.

compute gross income from property [2] with respect to its sales of granite products by use of the proportionate-profits method and whether petitioner's expenses relating to Federal income tax controversies are a cost of producing income from property which is to be deducted from gross income from property in arriving at taxable income from mining.

### FINDINGS OF FACT

Some of the facts have been stipulated. The stipulation and the exhibits entered into evidence are herein incorporated by this reference.

Petitioner is the North Carolina Granite Corp., a Delaware corporation organized in 1904. Petitioner's business is the quarrying, finishing, and sale of granite and granite products from its large quarry in Mount Airy, N.C.

Petitioner's principal office during the years at issue and at the filing of the petitions in these cases was located in Mount Airy, N.C. Petitioner is an accrual basis calendar year taxpayer which filed its returns for the taxable years 1959 through 1966 with the district director of internal revenue, Greensboro, N.C., and for taxable year 1967 with the Internal Revenue Service Center, Chamblee, Ga.

Petitioner is an integrated miner-manufacturer of granite products. It operates an open-face or surface quarry, the working area of which is approximately three-fourths of a mile in length, up to 1,800 feet in width, and exceeding 90 acres in area. The granite deposit is a solid mass and shows no seams or bed planes.

Petitioner's quarry is recognized as being the largest open-face quarry in the free world and is about 10 times larger than the largest of the more common pit quarries. Basically petitioner's quarry differs from a pit quarry in that its entire working surface is above ground whereas the working surface of a pit quarry is entirely below ground level.

Because of the size and other natural advantages of its quarry, petitioner was able to extract granite from the ground at about one-third the cost expended by its competitors who all operated pit quarries. For the years at issue petitioner's quarrying costs per cubic foot of granite were as follows:

| Year | Costs | Year | Costs |
|------|-------|------|-------|
| 1959 | $0.4853 | 1964 | $0.5409 |
| 1960 | .5269 | 1965 | .5529 |
| 1961 | .5212 | 1966 | .8070 |
| 1962 | .5368 | 1967 | .6205 |
| 1963 | .5318 | | |

[2] Under sec. 613(c)(1) gross income from property means gross income from mining in the case of property that is not an oil or gas well. We shall use gross income from mining interchangeably with gross income from property.

The economy of petitioner's quarrying operations stems from the fact that it is able to free acres of granite from the deposit in a single shelf by a process called "lifting." Lifting involves boring a deep hole in the uphill portion of the large area of granite to be extracted and exploding black powder charges in the hole. The black powder charges set in motion natural forces which free the granite from the deposit below. After the lifting process is complete, petitioner has a large mass of free granite which is quarried into blocks which can be removed by truck. We shall refer to granite in the state that it leaves the quarry throughout the opinion as rough granite stock, rough blocks, or unprocessed granite.

A pit quarry cannot employ lifting and is more costly to operate because granite can be freed only in small slabs and each block, after quarrying, must be removed from the pit on a crane.

Petitioner's granite is known as Mount Airy Granite which has been on the market since 1889. Mount Airy Granite is a standard granite often referred to as a basis for specifications that indicate a known granite. The strength of the granite in petitioner's quarry is substantially uniform; however, the granite is graded according to its esthetic value. The best grade is monumental granite which can be distinguished by the uniform and beautiful distribution of its mica markings. The next grade is building granite whose mica markings are slightly less uniform than those of monumental granite. The last grade is curbing or engineering granite which has unsightly streaks as a result of an irregular distribution of the mica. Petitioner's quarry superintendent makes the determination of the proper grade to be assigned to each block of granite as it leaves the quarry.

The monumental and building grades of Mount Airy Granite have a known and accepted meaning within the granite industry. All of the granite in petitioner's quarry is of high quality and hardness, but granite from other quarries can compete with it on the market.

Of the granite quarried by petitioner in the taxable years—

(a) a portion was sold from the quarry without the application of nonmining processes;

(b) a portion was processed by petitioner's crusher department and sold in crushed form for use principally as poultry grit, roadstone, concrete stone, and screenings;

(c) a portion was processed by the J. D. Sargent Granite Co. (hereafter Sargent) and sold for use principally in connection with buildings, bridges, and monuments; and

(d) a portion was processed by petitioner's curb department and sold principally for use as curbing and sawed bed ashlar. Sawed bed ashlar is granite sold in random lengths, without the application of

any grinding or polishing to the exterior face, for use in the exterior construction of buildings such as houses and churches.

The J. D. Sargent Granite Co. is an unincorporated division within petitioner. Prior to 1923 or 1924 Sargent was a separate corporation run by its founder, J. D. Sargent; however, after that time it merged with petitioner and ceased its separate corporate existence. Sargent has its own phone and bank account and is run by a separate vice president of petitioner. Sargent produces custom-order products made to an architect's specifications. Some of these products are made from building and monumental granite and include mausoleums, monuments, and bridges. However, a large part of the granite used in bridges fabricated by Sargent is an engineering grade identical to that used by the curb department.

The curb department is an unincorporated division within petitioner. It does not maintain a separate office, bank account, or telephone from petitioner's other (non-Sargent) operations. Neither historically nor during the years at issue did the curb department have its own separate management. The curb department used exclusively curbing or engineering grade granite. Its products—curbing and sawed bed ashlar—were made to standard sizes and were only roughly finished. They were not made to order or highly polished as were the products made by Sargent.

During the years at issue the comparative sales of Sargent and the curb department can be represented as follows:

| | Curb | | Sargent | |
|---|---|---|---|---|
| | Cubic feet | Total sales | Cubic feet | Total sales |
| 1959 | 178,905.00 | $612,241.92 | 75,337.50 | $661,015.44 |
| 1960 | 186,809.00 | 612,579.79 | 80,410.31 | 778,795.26 |
| 1961 | 153,187.00 | 570,837.94 | 111,574.82 | 877,296.91 |
| 1962 | 177,914.00 | 636,019.33 | 67,646.86 | 933,842.01 |
| 1963 | 181,409.00 | 631,324.26 | 55,613.83 | 869,526.44 |
| 1964 | 184,826.14 | 694,698.90 | 71,020.17 | 1,011,285.00 |
| 1965 | 190,710.56 | 701,704.73 | 38,042.10 | 650,842.49 |
| 1966 | 175,565.91 | 651,211.00 | 31,825.24 | 780,571.97 |
| 1967 | 190,961.75 | 786,351.12 | 76,097.73 | 1,027,119.43 |

Petitioner's sales of rough or unfinished granite blocks never amounted to a significant part of its business either in terms of sales receipts or cubic feet of granite sold.

During the years at issue the nonmining direct costs of Sargent and the curb department can be allocated in the following manner:

| Year | Curb department | Sargent Co. | Year | Curb department | Sargent Co. |
|---|---|---|---|---|---|
| 1959 | $255,411.46 | $598,894.80 | 1964 | $410,024.31 | $840,688.93 |
| 1960 | 375,347.55 | 606,886.30 | 1965 | 321,068.35 | 689,809.86 |
| 1961 | 331,345.05 | 762,187.20 | 1966 | 464,087.38 | 773,373.66 |
| 1962 | 371,077.11 | 786,545.54 | 1967 | 446,553.50 | 931,256.35 |
| 1963 | 357,772.17 | 747,946.57 | | | |

Petitioner maintained its books so that the profit from the finished granite products was allocated between the quarrying and finishing divisions. In order to accomplish this result petitioner's quarry charged the curb department and Sargent for the unprocessed granite used by them by way of a bookkeeping entry. The amount of the charge was set by one of petitioner's vice presidents and reflected a substantial markup over direct quarry costs. The actual charge varied according to the end use of the granite:

| Year | Quarry charges to curb department per cubic foot | | Quarry charges to Sargent per cubic foot | | |
|------|------|------|------|------|------|
| | Curbing | Ashlar | Building | Bridge | Monumental |
| 1959 | $0.90 | $1.00 | $1.40 to $2.15 | $0.75 to $1.50 | $1.50 to $3.00 |
| 1960 | 0.90 | 1.00 | 1.00 and 1.50 | 1.00 to 1.50 | 1.50 to 6.00 |
| 1961 | 0.90 | 1.00 | 1.10 to 2.00 | 1.00 to 2.00 | 1.50 to 4.00 |
| 1962 | 0.90 | 1.00 | 1.00 to 2.00 | 1.00 to 2.00 | 2.00 to 3.00 |
| 1963 | 0.90 | 1.00 | 1.00 to 2.00 | 1.00 and 1.25 | 2.00 to 6.00 |
| 1964 | 0.90 | 1.10 | 1.00 and 1.50 | 1.00 and 1.25 | 2.00 to 4.00 |
| 1965 | 0.90 | 1.10 | 1.50 and 2.50 | .69 to 1.25 | 2.00 to 3.50 |
| 1966 | 0.90 | 1.21 | .75 to 2.00 | .75 and 1.25 | 2.00 to 10.00 |
| 1967 | 0.90 | 1.21 | .75 to 2.50 | 1.25 and 1.50 | 1.50 to 6.00 |

Petitioner used the quarry's charge for unprocessed granite as the starting point for determining all prices charged to the customer. To the quarry charge petitioner added the direct costs of finishing the granite, certain administrative costs, and an amount which represented finishing profit. The sum of these charges was petitioner's list price in the case of ashlar, minimum price in the case of curbing, and bid price in the case of Sargent's custom-order products. Under petitioner's method of allocation, the quarry and curbing divisions operated at a substantial profit while Sargent operated at a loss. Petitioner's pricing formula failed to take into account certain wastes and inefficiencies in Sargent's operations, and in several years the prices charged by Sargent did not recoup the costs of making the product.

Petitioner has consistently included the quarry's charge for unprocessed granite as one factor in its pricing formula, but this charge is not disclosed to the customer of the finished product. Petitioner does not bargain with its customers over the quarry's charge for granite but only over the price for the final item. Petitioner has never sold or offered for sale rough granite stock at prices equal to its quarry charges.

During the years at issue petitioner incurred expenses relating to Federal income tax controversies in the following amounts:

| Year | Amount | Year | Amount |
|------|--------|------|--------|
| 1960 | $3,610.00 | 1964 | ---------- |
| 1961 | 1,425.26 | 1965 | $22,511.97 |
| 1962 | 450.55 | 1966 | ---------- |
| 1963 | 9,889.07 | 1967 | 8,956.52 |

OPINION

Petitioner is an integrated miner-manufacturer of granite products. Its quarry in Mount Airy, N.C., not only is the largest in the free world but also is possessed of such extraordinary natural characteristics that petitioner can extract granite for about a third of the cost that its competitors must bear. Petitioner sells very little of its granite without application of nonmining processes. The primary issue in this case is the proper method of determining petitioner's gross income from property under section 613(c) for purposes of computing percentage depletion with respect to its sales of finished granite products. The deductions for depletion with respect to petitioner's sales of crushed granite and rough granite stock are not in issue.

A further issue to be decided is whether petitioner's expenses incurred in Federal income tax controversies are a cost of producing mining income and hence a required deduction from gross income from mining in arriving at taxable income from mining.

### Gross Income From Mining

Petitioner and respondent agree that *United States* v. *Cannelton Sewer Pipe Co.*, 364 U.S. 76, 88 (1960), states the proper rule for determining gross income from mining where an integrated miner-manufacturer does not sell its product before the application of nonmining or finishing processes.[3] The Supreme Court in *Cannelton* postulated a rule whose statement is more simple than is its application: That the gross income from mining does not contain any element of cost or profit attributable to nonmining or finishing processes. The purpose of the rule was to provide equal treatment for integrated

---

[3] The statutory framework for the deduction for depletion is the following:
SEC. 611. ALLOWANCE OF DEDUCTION FOR DEPLETION.
(a) GENERAL RULE.—In the case of mines, oil and gas wells, other natural deposits, and timber, there shall be allowed as a deduction in computing taxable income a reasonable allowance for depletion and for depreciation of improvements, according to the peculiar conditions in each case; such reasonable allowance in all cases to be made under regulations prescribed by the Secretary or his delegate. * * *
SEC. 613. PERCENTAGE DEPLETION.
(a) GENERAL RULE.—In the case of the mines, wells, and other natural deposits listed in subsection (b), the allowance for depletion under section 611 shall be the percentage, specified in subsection (b), of the gross income from the property excluding from such gross income an amount equal to any rents or royalties paid or incurred by the taxpayer in respect of the property. Such allowance shall not exceed 50 percent of the taxpayer's taxable income from the property (computed without allowance for depletion). * * *
     *          *          *          *          *          *          *
(c) DEFINITION OF GROSS INCOME FROM PROPERTY.—For purposes of this section—
     (1) GROSS INCOME FROM THE PROPERTY.—The term "gross income from the property" means, in the case of a property other than an oil or gas well, the gross income from mining.

and nonintegrated producers of minerals. Because the deduction for depletion computed under section 613 is merely a percentage of the producer's gross income from mining, the inclusion in gross income from mining of elements of profit and cost attributable to the processes required to change raw materials into finished products would inflate the deduction in favor of the producer who only sells his minerals in a processed from. Therefore, the integrated miner-manufacturer is required to compute its deduction for depletion as if it sold all of its minerals in their unfinished state. In essence, the integrated producer is to sell to itself and use the hypothetical sales price of the unfinished minerals in computing its gross income from mining. *United States* v. *California Portland Cement Co.*, 413 F. 2d 161 (C.A. 9, 1969); *Standard Lime & Cement Co.* v. *United States*, 329 F. 2d 939 (Ct. Cl. 1964).

The parties cannot agree on the proper hypothetical sales price to assign to petitioner's rough-cut granite, and their disagreement has manifested itself in unwarranted and unhelpful hyperbole in their briefs. A hypothetical determination is inherently less satisfactory than one based upon empirical data, but the parties have not helped this Court toward its decision by their hot rhetoric.

Respondent's regulations generally permit an integrated miner-manufacturer to determine gross income from mining attributable to sales of finished products in one of three ways. Sec. 1.613–3, Income Tax Regs. First, if the integrated producer sells sufficient quantities of minerals in their unprocessed form which are similar to those used in the finished items, the producer can use its own price for computing gross income from mining attributable to the raw mineral content of the end product. Second, if the producer's sales of raw minerals are insubstantial and not representative of a market price that would prevail in its area, the producer can use the market price in its area of minerals similar to those used in its finished products. Third, if the first and second alternatives cannot be applied or if market price in the area is unrealistic in light of special circumstances in the producer's operations (i.e., the market price of the raw material was greater than that for the finished product), the producer is to use the proportionate-profits method. The regulations appear to limit a producer's alternatives to the three enumerated; however, producers are permitted to compute gross income from mining in a manner not stated in the regulations where they can show both that respondent's method was unfair and that another method would produce a more accurate result. *United States* v. *Portland Cement Co.*, *of Utah*, 338 F. 2d 798 (C.A. 10, 1964).[4]

---

[4] Respondent conceded on brief that petitioner might use another method but disputes that petitioner has used another method that is more accurate. Respondent apparently adopts the position of sec. 1.613–3 (d) (2), proposed Income Tax Regs.

At trial petitioner conceded that its sales of unfinished granite blocks were minimal and that the prices charged in these sales were not indicative of the price it would charge if it regularly sold rough granite blocks. On its returns for the years at issue petitioner computed its gross income from mining using prices which apparently reflected its estimation of the representative market price in its area. Prior to trial petitioner gave up reliance upon the prices shown in its tax returns, and at trial it did not attempt to show what the market price for rough granite was in its area.

Petitioner's failure to show either its own or another's market price should, if the regulations are applied literally, require the use of the proportionate-profits formula; however, petitioner makes two arguments to circumvent this result. Both of them involve using the charges for unprocessed granite in petitioner's pricing formula to determine gross income from mining.[5]

During the 9-year period, petitioner's costs to quarry a net cubic foot of granite amounted to approximately $0.50 to $0.60. In figuring its prices for finished products petitioner calculated the granite content at about $1 per cubic foot for the products made by the curb department and at about $1.50 for Sargent's products. Petitioner's internal accounting system reflected similar charges for granite imposed by the quarry on the curb department and Sargent. In most cases these charges amounted to less than the cost that petitioner's competitors had to bear merely to extract their granite from the ground.

From these facts petitioner argues that these charges were fair and reasonable and that of necessity they were less than the market price for granite because no one could sell for less and break even. Hence, under this analysis, petitioner contends it is entitled to use its quarry charges in computing gross income from mining.

We do not doubt that the charges made by petitioner's quarry to its finishing divisions were reasonable or that none of petitioner's competitors could have sold granite for a price that was less than these charges. However, it has not been demonstrated that anyone sold unprocessed granite in sufficient quantities to establish a market price. The Supreme Court noted in *United States* v. *Cannelton Sewer Pipe Co., supra,* that depletion does not depend upon the cost of the unprocessed minerals but upon their price. See also *Standard Lime & Cement Co.* v. *United States, supra.* Nothing in the record indicates

---

[5] On brief petitioner denies that it ever contended that its quarry charges represented the market price of rough granite; however, the evidence offered at trial is relevant to such a contention, and respondent has argued at great length as if petitioner did make such a claim. Therefore, we shall discuss whether petitioner's quarry charges represented a market price for granite.

that the charges made by petitioner's quarry, however reasonable, represented the price of unfinished granite.

Petitioner's second and main argument is that the quarry charges were the prices actually paid by the customer for the unprocessed granite.[6] For example, during the 9 years petitioner computed its sales price for curbing by including the rough granite content at $0.90 per cubic foot. Petitioner contends that the buyer actually paid $0.90 per cubic foot for the rough granite and that it is entitled to use this sales price as its basis for computing gross income from mining. In a sense petitioner's contention is true. The buyer did pay petitioner's price for the rough granite merely by buying the finished curbing, but this fact does not indicate that petitioner actually sold rough granite for $0.90 per cubic foot. Petitioner in no case disclosed his charge for rough granite to its customer. It never bargained about the charge. In short, the taxpayer did nothing which would normally be associated with the setting of a sales price. It may be possible for a manufacturer to establish individual sales prices for the component parts of a finished product, but we are certain that to do so it must do more than use a specific charge in its pricing formula which is never disclosed to the customer.

We conclude then that petitioner's quarry charges do not represent either a representative market price or its own sales price for unprocessed granite. In order to understand why petitioner has tried so hard to show a sale price for rough granite stock it is necessary to examine both the proportionate-profits formula and the manner in which respondent has applied it in petitioner's case.

The theory underlying the proportionate-profits formula is that every dollar of the cost of producing an item generates a ratable portion of the profit from its sale. Section 1.613–3(d)(1)(ii) of the regulations expresses the formula in the following way:

$$\frac{\text{Mining costs}}{\text{Total costs}} \times \text{Gross sales} = \text{Gross income from mining}$$

Petitioner's argument that the application of this formula to its operations would bring about an unreasonable result is persuasive.

It is clear that under the formula the lower the mining costs the

---

[6] Yet another alternative theory is advanced by petitioner: That gross income from mining attributable to the products sold by the curb department be computed by using the quarry charges as actual sale prices for the unprocessed granite content in these items and that the gross income from mining attributable to the products sold by Sargent be computed by using the lowest of the curb department's charges as the actual sale price of the unprocessed granite content. Because we find that none of the quarry charges were actual sale prices, we cannot adopt this alternative method; however, it will be seen that our application of the proportionate-profits method will approximate the result sought by petitioner with this alternative.

lower the gross income from mining. Petitioner's argument is that its low mining costs do not result in fact in a low sales price for its rough granite stock but merely indicate that its mining operations are exceptionally profitable. In essence, petitioner contends that by linking gross income to mining costs the formula fails to accord him the profit from mining that his low quarry costs permit.

Petitioner has been able to show that its prices for finished products are competitive and that its finishing costs are at least not smaller than those of its competitors. Therefore, it does follow that because petitioner's quarrying costs are considerably lower than those of its competitors a greater part of its profit is due to its quarrying operations rather than to its finishing. The assumption of the formula, that a low mining cost will produce a proportionately small gross income from mining, is anomalous in petitioner's situation.

Further evidence against the use of the proportionate-profits formula in petitioner's case is the fact the J. D. Sargent Granite Co. was responsible for about 65–70 percent of petitioner's nonmining direct costs while it only accounted for about 20–25 percent of the cubic feet of granite sold. The record indicates that the granite used by Sargent was no more expensive to extract from the ground than that used by the curb department and that it would command at least as great a price on the market as the inferior granite used by the curb department. In fact, in many cases the granite used by Sargent was exactly the same as that used by the curb department.

The record also indicates that Sargent did not operate as profitably as did the curb department. Although respondent contends that Sargent's losses were merely the result of the high charge for granite made by the quarry, petitioner has correctly pointed out that Sargent would have lost money on the sale of its products even if it had not been charged any direct cost by the quarry for the granite content of its products. Therefore, it is clear that not every dollar of cost in petitioner's operations produced the same amount of profit. Sargent's nonmining costs produced little or no profit when compared to the productivity of the curb department's nonmining costs, and the inclusion of Sargent's nonmining costs in the proportionate-profits formula skews its result unfairly in the direction of nonmining gross income.

Although we believe that the proportionate-profits method employed by respondent does understate petitioner's gross income from mining by failing to account for petitioner's overall low quarry costs and the high nonmining costs of Sargent, we do not believe that petitioner has demonstrated a more accurate method of determining its gross income from mining. Respondent's regulations have been upheld as a reason-

able exercise of specific authority granted by section 613(a), and to deviate from them would require a showing not only that they were unfair in petitioner's case but also that petitioner employed a method that was more accurate. *United States* v. *California Portland Cement Co., supra* at 164; *United States* v. *Portland Cement Co. of Utah*; *Commissioner* v. *South Texas Co.*, 333 U.S. 496 (1948).

The purpose of any method of computing gross income from mining is to arrive at a figure which approximates the result that would obtain if actual market prices were available for rough mineral stock. As noted previously, petitioner did not offer evidence concerning the market price of unfinished granite. Therefore, it is not possible to use petitioner's quarry charges, as petitioner urges, in determining gross income because there is no way to reliably compare these charges to market prices. In the absence of another method the proportionate-profits method must be applied; however, it is not necessary to apply it in such a way that petitioner's low mining prices are used to its disadvantage.

We found earlier that some of the distortions in the constructive sales price are caused by including the high costs of Sargent's operations in the proportionate-profits formula. Respondent's insistence that Sargent's costs be included in applying the formula is in our opinion inconsistent with the facts of this case and the theory underlying the proportionate-profits formula. In fact, section 1.613-3(d)(1) of the regulations seems to require a different application of the formula from that urged by respondent. In order to avoid the problem present here the regulations require that the "taxpayer's gross sales * * * of his first marketable product" be multipled "by a fraction whose numerator is the sum of all the costs allocable to those mining processes which are applied to produce * * * the first marketable product * * * and whose denominator is the total of all mining and nonmining costs paid or incurred to produce * * * the first marketable product." Sec. 1.613-3(d)(1)(ii), Income Tax Regs. The regulation later defines the first marketable product or group of products to be those finished or manufactured items which are first sold in significant quantities by the taxpayer or another producer in his area.

The tenor of the regulation is that the formula should be applied to those products which are the least refined or finished for which a significant market exists. For example, if a manufacturer of bricks makes both glazed and unglazed bricks from its own clay, the constructive sales price of its clay is to be determined by use of the sales of its unglazed brick. The purpose of the proportionate-profits formula is to separate the sales price of a product into its mining and nonmining components. The separation will be achieved most ac-

curately with products which most closely resemble the natural materials from which they are made.

In this case the curbing and ashlar products made by petitioner's curb department are produced by sawing the rough granite stock into useful sizes and knocking off unwanted projections with a chisel and hammer. The processes applied by the curb department are simple, even primitive, and the end product closely resembles the granite in its rough state. On the other hand, the custom order mausoleums and monuments sold by Sargent are the result of more sophisticated finishing techniques. Each product is measured to exact dimensions, highly polished, and in many cases decorated with engraving. Sargent's products bear little resemblance to rough granite stock or to curbing or ashlar.

Although Sargent's products are not "additionally refined" (as the words appear to be used in the regulations) in the sense that curbing and ashlar could be further finished to produce them, we do not believe that they represent a first marketable product of petitioner under the rationale, if not the letter, of respondent's regulation. Cf. sec. 1.613-3(d)(1)(iv), Income Tax Regs. As respondent was quick to point out at trial, all of petitioner's granite could be used in the products made by the curb department (if a manufacturer was disposed to use its most beautiful stone to make curbs). Indeed, only a part of the granite used by Sargent was monumental or building grade, and the rest was engineering grade like that used by the curb department. The granite used by Sargent could not command a lesser price in its unfinished state than that used by the curb department. In view of the fact that over 75 percent of the cubic feet of granite sold by petitioner was contained in the curb department's products we believe that the most reliable hypothetical price for rough granite stock can be determined by dividing the gross income from the sale of the curb department's products into its mining and nonmining components. Where such a significant amount of sales of roughly finished products exists, a hypothetical price based in part upon sales of highly sophisticated products can only be less accurate than one based solely upon sales of the roughly finished products.

Accordingly, in applying the proportionate-profits formula the parties shall use only the costs of producing the items sold by the curb department and the gross sales of the curb department. After determining the gross income from mining attributable to the curb department's sales, the constructive sales price of a cubic foot of petitioner's granite can be ascertained and this constructive sales price used to determine the gross income from mining attributable to sales of Sargent's products. The gross incomes from mining attributable to

the curb department and to Sargent can be combined and used in the computation of taxable income from mining under section 1.613-4 of the regulations.

### Federal Income Tax Controversy Expenses

The remaining issue concerns one facet of the determination of taxable income from mining. During the years at issue petitioner expended considerable sums relating to Federal income tax controversies. All of these controversies, including a prior case before this Court, involved different aspects in determining petitioner's deduction for depletion for years not here in issue. It is respondent's contention that all or a part of these expenses are deductible from gross income from mining in determining taxable income from mining.[7] The effect of the adjustment is to reduce the amount of the deduction for percentage depletion allowable under section 611 because section 613(a) limits the depletion deduction to 50 percent of the taxable income from property.

Respondent cites *United States* v. *California Portland Cement Co.*, *supra*, as requiring that part of the tax controversy expenses be included in the computation of taxable income from mining. In that case the Ninth Circuit reviewed the allocation between mining and nonmining income of several types of expenses, and in dealing with the selling expenses incurred by an integrated miner-manufacturer stated the following:

Thus, we hold that if an expense is incurred for the benefit of the entire operation, as the district court found the selling expenses were in the present case, it can properly be allocated between mining and manufacturing. * * * [413 F. 2d at 172.]

In this case the expenditures relating to petitioner's tax controversies did in fact benefit its entire operation as petitioner was successful in obtaining a refund of tax for several years in addition to a net operating loss carryover; however, we believe that respondent is misplacing his reliance on *United States* v. *California Portland Cement Co.*, *supra*. The costs of obtaining the tax benefits in this case, although without dispute deductible under section 162, did not produce

[7] On brief respondent has argued another issue entirely. He there contends that petitioner's tax controversy expenses should be included in the costs entering into the proportionate-profits formula. As petitioner points out, the parties have stipulated that all indirect costs are to be allocated between mining and nonmining income in the same proportion that obtains for direct mining and nonmining costs. Therefore, regardless of what other costs are plugged into the formula, the ratio of mining costs to total costs will be a constant determined by the ratio of direct mining costs to direct nonmining costs. The issue presented by the record and the stipulation is whether any part of the tax controversy expenses are to be deducted from gross income from mining in order to arrive at taxable income from mining. In over 150 pages of briefs respondent has not addressed a single word squarely at the issue.

a penny of taxable income as did all of the expenses considered in *California Portland Cement Co.* Even though the tax controversies all centered on the mining part of petitioner's enterprise, the expenses were not in any way essential to the production of income from mining. In *United States Potash Co.*, 29 T.C. 1071 (1958), we held that charitable contributions were not a cost of producing income from property and hence not deductible in determining taxable income from property. See also *F. E. H. Oil Co.*, 3 T.C. 13 (1944). Respondent agreed to follow our decisions in Rev. Rul. 60–70. We noted in these cases that not every expense that is deductible from gross income is also deductible from gross income from property. Petitioner's expenses relating to its Federal income tax controversies are not attributable to the production of mining income; therefore, we hold that they are not to be deducted in computing taxable income from mining. See in this respect *Island Creek Coal Co.* v. *Commissioner*, 382 F. 2d 35 (C.A. 4, 1967).

*Decisions will be entered under Rule 50.*

