UNITED STATES of America, Plaintiff,

v.

The CLAYCRAFT COMPANY, Defendant.

Civ. A. No. 6308.

United States District Court,
S. D. Ohio, E. D.

Sept. 26, 1972.

---

Robert L. Handros, Tax Div., U. S. Dept. of Justice, for plaintiff.

Lyman Brownfield, Brownfield, Kosydar, Bowen, Bally & Sturtz, Columbus, Ohio, for defendant.

## OPINION AND ORDER

KINNEARY, Chief Judge.

This action was instituted by the United States to recover allegedly erroneous refunds of taxes plus interest from the Claycraft Company. The total amount of the refunds is $50,003.14 for the fiscal year ending November 30, 1956 [1956]. Included in this total is the sum of $7,994.05, which constituted a net operating loss carryback from the fiscal year ending November 30, 1959 [1959]. The jurisdiction of the Court arises under Title 28, United States Code, §§ 1340 and 1345, and Title 26, United States Code, § 7405(b), and is not contested.

On February 28, 1968, the Court filed an Opinion and Order denying the relief requested by the United States. Subsequently, the Sixth Circuit Court of Appeals remanded the case with directions to make findings of fact, state conclusions of law, and enter proper judgment in accordance with the provisions of Rule 52(a) of the Federal Rules of Civil Procedure as construed in Deal v. Cincinnati Board of Education, 369 F.2d 55 (6th Cir. 1966), cert. denied, 389 U.S. 847, 88 S.Ct. 39, 19 L.Ed.2d 114 (1967).

For reasons stated below, this Court upon reconsideration determines that its earlier Opinion and Order denying relief to the plaintiff was erroneous.

The following findings of fact are made upon the entire record in the case. This case was tried to the Court on November 29, 30 and December 1, 2, 1966. Neither party has proferred additional evidence following the remand.

## INTRODUCTION

Claycraft is an integrated miner-manufacturer of clay and clay products. During 1956 and 1959 the mines owned and operated by Claycraft and the raw materials extracted from each were:

| Mine No. | Location | Mineral |
|---|---|---|
| 1 | Wyandot | — surface clay |
| 2 | Shawnee | — fireclay |
| 3 | Sugarcreek | — shale |
| 4 | Taylor | — shale |

Under the provisions of 26 U.S.C. § 613, Claycraft's income tax return for 1956 claimed a percentage depletion deduction for clay and shale mined. In accordance with the statute, the depletion deduction was computed on the basis of fifteen per cent (15%) of the gross income from the fireclay mined at Shawnee, and five per cent (5%) of the gross income from the clay and shale mined at Sugarcreek, Taylor and Wyandot.

In 1956 and also in 1959 there was an industry-wide dispute between integrated miner-manufacturers of clay and clay products and the Internal Revenue Service concerning the proper basis for determining gross income from mining. Integrated miner-manufacturers contended they were entitled to a percent-

age depletion allowance based on gross sales of finished clay products. The Internal Revenue Service took the position that gross income from mining was equal. to the market value of the raw mineral product.

In Ohio, the Internal Revenue Service entered into an industry-wide discussion of the proper valuation for percentage depletion purposes of clay and shale. The negotiated valuation was $5.00 per ton for surface clay and shale and $7.00 per ton for fireclay. A representative of the government testified that the agreed prices represented the gross income from mineral after extraction, separation from waste, grinding and screening and secondary screening up to but not including pug mill operations. Claycraft used these industry-wide figures in preparing its 1956 income tax return.[1]

On January 29, 1960, the Internal Revenue Service, on its own initiative and without application by Claycraft, made a tax refund to defendant for 1956 in the amount of $36,261.87 with $5,747.22 in interest, the total amount of the refund being $42,009.09, disbursed $39,541.90 in cash and $2,467.19 as a credit against outstanding liabilities. The refund resulted from an Internal Revenue Service decision to compute the depletion allowance as a percentage of gross income from the finished product rather than as a percentage of the gross income from the raw mineral product.

In its 1959 income tax return Claycraft claimed depletion as a percentage of its gross income from sales of finished brick and tile, claiming a net operating loss carry-back from 1959 to 1956

1. Defendant's brief suggests that the $5.00 and $7.00 per ton figures represent a compromise not only of the percentage depletion issue, but also other tax liabilities of Claycraft. This argument is not supported by the record. The price per ton agreement was industry-wide in Ohio. If Claycraft had unrelated disputes with Internal Revenue, those claims could have been made separately. In fact, Claycraft's President Teff testified concerning only one disputed item—deductions Claycraft claimed for payments to the widow of a Claycraft officer. Assuming Claycraft genuinely intended to compromise this claim by adopting the $5.00 and $7.00 per ton figures, then it, in effect, agreed that its clay and shale were properly valued at something less than $5.00 and $7.00 per ton.

in the amount of $15,109.28.[2] This resulted in a tax refund for 1956 of $7,856.83 with interest in the amount of $137.22 for a total refund of $7,994.05.

■ Following the Internal Revenue Service's capitulation on the definition of "gross income from mining", the United States Supreme Court held that Congress intended by 26 U.S.C. § 613

> to grant miners a depletion allowance based on the constructive income from the raw mineral product, if marketable in that form, and not on the value of the finished articles. United States v. Cannelton Sewer Pipe Co., 364 U.S. 76, 86, 80 S.Ct. 1581, 1586, 4 L.Ed.2d 1581 (1960).

*Cannelton* applies retroactively. *See,* Riddell v. Monolith Portland Cement Co., 371 U.S. 537, 83 S.Ct. 378, 9 L.Ed.2d 492 (1963); United States v. Sparta Ceramic Co., 286 F.2d 429 (6th Cir. 1960). The parties herein agree that *Cannelton* is controlling. Thus, at the outset, the Government has established a *prima facie* case that the refund was erroneous. This alone does not entitle it to relief. The amount of the refund recoverable, if any, must be determined.

■ Usually the taxpayer is plaintiff in a tax refund suit and consequently bears the burden of proof. Here the United States sues to recover a refund erroneously made. As plaintiff, the Government must prove the amount erroneously refunded. Soltertmann v. United States, 272 F.2d 387 (9th Cir. 1959). *See,* United States v. Russell Manufacturing Co., 245 F.Supp. 159 (D.Conn.1964), affirmed 349 F.2d 13 (2d Cir. 1965).

The ultimate factual issue is the amount of the gross income from mining from each of the mining properties in 1956 and 1959. Claycraft did not sell any crude clay or shale in those or any other years, therefore a constructive gross income must be proven.

Gross income from mining is defined in 26 U.S.C. § 613(c). Mining includes "not merely the extraction of the . . . minerals from the ground but also the ordinary treatment processes [and necessary transportation] normally applied . . . to obtain the commercially marketable product." If the mineral product is then sold, its basis for depletion is established. When the mineral product is further processed beyond its first commercially marketable stage, the constructive gross income from the mineral product is established by one of two methods set out in Treasury Regulation 118, § 39.23(m)–1(e)(3): [3]

> (1) The *"representative market or field price* (as of the date of sale) of a mineral product of like kind or grade. . . ."

---

2. In 1959, as a result of a statutory amendment, the percentage depletion allowable for fireclay was 5%. The percentage depletion allowable remained 5% for surface clay and shale.

3. If the taxpayer sells crude mineral product of the property in the immediate vicinity of the mine, "gross income from the property" means the amount for which such product was sold, but, if the product is transported or processed (other than by the ordinary treatment processes described below) before sale, "gross income from the property" means the representative market or field price (as of the date of sale) of a mineral product of like kind and grade as beneficiated by the ordinary treatment processes actually applied, before transportation of such product (other than transportation treated, for the taxable year, as mining). If there is no such representative market or field price (as of the date of sale), then there shall be used in lieu thereof, the representative market or field price of the first marketable product resulting from any process or processes (or, if the product in its crude mineral state is merely transported, the price for which sold) minus the costs and proportionate profits attributable to the transportation (other than transportation treated for the taxable year, as mining) and the processes beyond the ordinary treatment processes. If the taxpayer establishes to the satisfaction of the Commissioner that another method of computation, other than the computation of profits proportionate to costs clearly reflects the gross income from the property, then such gross income shall be computed by such other method.

(2) If there is no representative market or field price the *proportionate profits method* is used. In this method the constructive gross income from the mineral product is expressed as a ratio of mining costs to manufacturing costs.

The Court will first consider whether the Government has established a representative market or field price for Claycraft's clay and shale.

## EVIDENCE OF REPRESENTATIVE MARKET OR FIELD PRICES.

The evidence with respect to each mine will be discussed separately below.

*Mine No. 1, Wyandot*

Glacial drift surface clay is mined by power shovel from an open pit. It is dried in a rotary drier, then ground and screened to separate the clay from limestone.

The clay is molded and burnt in kilns at Upper Sandusky, Ohio producing a sand mold brick. Most of the brick is sold in this form. Some brick is shipped to Claycraft's Columbus, Ohio plant. There it is burned for a second time and a colored glaze is placed on one surface. This brick, because of the glaze, sells at roughly three times the value of the unglazed unit.

The Wyandot sand mold bricks have unusual architectural appeal because of their non-uniform fluted texture. Their average selling price is approximately 20% higher than other red face brick.

The Government seeks to establish the representative field or market price of the Wyandot surface clay by reference to figures published by the United States Bureau of Mines. The 1956 Minerals Yearbook reports that 265,524 short tons of miscellaneous clays, including shale and slip clay, were sold by Ohio producers during 1956 for $226,841. The Wyandot glacial surface clay is included within the category of miscellaneous clays. Thus, the Government contends that the 1956 representative field or market price is $.85 per ton.[4]

The 1959 Minerals Yearbook reports that 171,207 short tons of miscellaneous clays, including shale and slip clay, were sold by Ohio producers during 1959 for $206,365.00. The Government asserts that the 1959 representative field price of the Wyandot surface clay is $1.21 per ton.[5]

■ The representative market or field price of the Wyandot clay, if any, is not established by the average per ton price of miscellaneous clays as reported in the 1956 and 1959 Minerals Yearbooks.[6]

The Bureau of Mines gathers data by requesting producers to voluntarily report "reasonably accurate estimates" of the value of the clay they produce. The

4. Claycraft's Wyandot operation mined and shipped 30,001 tons of clay in 1956. Using the $0.85 per ton figure, the gross income from mining at Wyandot would have been $25,500.85 ($0.85 x 30,001). The cost of mining was $22,627.99. Net income from mining was $2,872.86. The allowable depletion is the lower of (1) 5% of the gross income from mining (.05 x $25,500.85 = $1,275.04) or (2) 50% of the net income from mining (.50 x $2,872.86 = $1,436.43). Using the Government's proposed representative field or market value the allowable percentage depletion for the Wyandot property for 1956 was $1,275.04.

5. Claycraft's Wyandot operation mined and shipped 29,476 tons of clay in 1959. Using the $1.21 per ton figure, the gross income from mining at Wyandot would have been $35,665.96. The cost of mining was $26,164.99. Net income from mining was $12,443.69. The allowable depletion is the lower of (1) 5% of the gross income from mining (.05 x $35,665.96 = $1,783.30 or (2) 50% of the net income from mining (.50 x $12,443.69 = $6,221.85). Using the Government's proposed representative field or market price the allowable percentage depletion for the Wyandot property for 1956 was $1,783.30.

6. The following discussion is also applicable to the Government's attempt to use the Minerals Yearbook prices to prove the representative market or field price of the mineral products of the Shawnee, Sugarcreek and Taylor mines.

Minerals Yearbook's Ohio tonnage and value figures relied upon by the Government report "miscellaneous clays, including shale and slip clays sold by producers" in 1956 and 1959. Most clay in Ohio is not sold by producers, but used by integrated miner-manufacturers to produce a finished clay product.[7] Claycraft itself sold none of the clay or shale it mined; and it bought no clay for any primary production use.

Although the "miscellaneous clays" category clearly includes the Wyandot clay, it also includes other clays which are not of like grade. Treasury Regulation 118 requires that the representative market or field price be established by reference to the market or field price of mineral products of "like kind and grade."

The qualifying phrase "like kind and grade" does not mean that the comparison mineral products must be the same as or identical to the mineral product whose value is to be determined. United States v. Henderson Clay Products, 324 F.2d 7, 11 (5th Cir. 1963), cert. denied, 377 U.S. 917, 84 S.Ct. 1182, 12 L.Ed.2d 186 (1964). If the mineral products are suitable for the same general commercial use they are of "like kind and grade." Alabama By-Products Corp. v. Patterson, 258 F.2d 892 (5th Cir. 1958).

The Minerals Yearbook category miscellaneous clays include slip clay which has a much higher value than the average and oil well mud clays and mortar clays which have a lower value. The category lumps together clays which are not suitable for similar general commercial use. Claycraft's Wyandot clay is used to produce a face brick. Its constructive market value cannot be determined with reference to clays used for oil well mud, mortar, various grades of drainage tile, and other dissimilar commercial uses.

### Mine No. 2, Shawnee

The Shawnee mine, located at Shawnee, Ohio, produces a Brookville No. 4 plastic fireclay. The fireclay is suitable for intermediate heat duty fire brick, glazed brick and tile, and lightweight insulating fire brick. It is actually used to manufacture a durable glazed brick for exterior use.

Shawnee is an underground shaft mine. After the fireclay is removed from the mine it is crushed. Some of the fireclay is then shipped to Claycraft's manufacturing plant at Columbus. The remaining fireclay is used at the Shawnee manufacturing plant. The fireclay is ground and screened, then it is manufactured into glazed brick by extrusion and burning.

The Government attempted to establish the representative market or field price of the Shawnee fireclay by two methods (1) The Mineral Yearbook's statistics on Ohio fireclay tonnage and value, and (2) the average selling price of Brookville No. 4 clay sold by producers mining the same geological formations as Claycraft.

The 1956 Minerals Yearbook published by the United States Bureau of Mines reported that 988,724 short tons of fireclay were sold by producers in Ohio during 1956 for $2,872,176. The average price per ton is $2.90.[8]

The 1959 Minerals Yearbook reported 568,066 short tons of fireclay sold by

---

7. Expert testimony established the predominance of miner-manufacturers. In terms of tonnage, the 1956 Mineral Yearbook reported 265,524 tons sold by producers and 3,272,287 tons used by producers.

8. Claycraft's Shawnee operation mined 71,123 tons of fireclay in 1956. Using the $2.90 per ton figure, the gross income from mining at Shawnee would have been

$206,256.70. The cost of mining at Shawnee cannot be computed because Claycraft failed to maintain adequate cost records. The Shawnee and Taylor costs are not separable, and were therefore considered as one unit by the Government. See pp. 1370–1371, *post*. The allowable depletion for the Shawnee fireclay, using the 1956 Minerals Yearbook figures, would be $30,938.51. [For the computation see f.n. 14, *post*.]

Ohio producers in 1959 for $2,296,240. The average price is $4.04 per ton.[9]

■ For the same reasons discussed above with reference to the Minerals Yearbook's "miscellaneous clays" statistics, the Court finds that the Minerals Yearbook's 1956 and 1959 statistics reporting "fireclay, including stoneware clay sold by producers" in Ohio does not establish the representative market or field price of Shawnee fireclay for depletion purposes.

Expert testimony established that Ohio fireclays include Brookville No. 4, Kittaning No. 5, Kittaning No. 6 and Tionesta. Geologically, there are three basic kinds of fireclays in Ohio: flint, semi-flint and plastic. There are three, or perhaps four, commercial grades of fireclay. Fireclays vary in their suitability for refractory use. In addition, all fireclays are not commercially suitable for use as face brick.

The Minerals Yearbooks do not differentiate among various commercial grades of fireclays and therefore do not establish the representative market or field price of Shawnee fireclay.

The Government also attempted to prove the representative market or field price of the Shawnee fireclay by deposing producers of fireclay from the same geological formation as the Shawnee mine, i. e. Kittaning No. 5 and Brookville No. 4. The Mullet Coal Company of Mount Eaton, Ohio mined clay from the Kittaning No. 5 and Brookville No. 4 strata which it sold for $1.00 per ton in 1956. The West Darlington clay company [Metropolitan Brick] of Negley, Ohio mined Kittaning No. 5 clay which it sold for $2.35–2.50 per ton in 1956. These were the only two producers the Government deposed whose clays were arguably similar to the Shawnee fireclay.

Although the Shawnee mine is located in an area having both Kittaning No. 5 and Brookville No. 4 formations, Claycraft mines only a high grade Brookville No. 4 plastic fireclay at Shawnee. The Mullet and West Darlington mines produce Kittaning No. 5 clay which, by a preponderance of the evidence the Court finds is not of like kind and grade with the Shawnee Brookville No. 4 fireclay.[10]

*Mine No. 3, Sugarcreek*

Claycraft mines Homewood shale and some Brookville No. 4 clay by shooting and power shovel at its Sugarcreek mine, Sugarcreek, Ohio. It is then transported to a nearby plant where it is crushed and ground. The Sugarcreek shale and clay is manufactured into face brick by extrusion and burning.

Claycraft's President Teff testified that the Sugarcreek Brookville No. 4 clay was not of the same high quality as the Shawnee fireclay. The shale is also of an average grade. For many commercial uses, shale and clay are interchangeable.

The Government contends that the representative market or field value of the Sugarcreek shale and clay is the average price of miscellaneous clays from the 1956 and 1959 Minerals Yearbooks published by the United States

9. Claycraft's Shawnee operation mined 66,418 tons of fireclay in 1959. Using the $4.04 per ton figure, the gross income from mining at Shawnee would be $268,328.72. Claycraft did not keep separate mining cost records for the Shawnee and Taylor operations in 1956 and 1959. Consequently, the cost of mining at Shawnee cannot be computed. The cost of mining for Shawnee and Taylor, together, is computed below. *See* f.n. 15. The allowable depletion for the Shawnee fireclay using the Minerals Yearbook figures would be $13,416.44 (.05 x $268,328.72).

10. An officer of Metropolitan Brick, the owner of the West Darlington mine testified on deposition that the West Darlington clay was not suitable for use by Metropolitan Brick in the manufacture of brick and tile. Claycraft attempted to use Mullet .clay for face brick and found it unsatisfactory. The Shawnee fireclay produces a top grade glazed exterior brick, and thus is of a different grade than the West Darlington and Mullet clays.

Bureau of Mines. In 1956 the average price of miscellaneous clays was $0.85 per ton.[11] In 1959 the average price of miscellaneous clays was $1.21 per ton.[12]

■ For reasons previously discussed,[13] the Court holds that the 1956 and 1959 Minerals Yearbooks' statistics reporting the tonnage and value of miscellaneous clays in Ohio include mineral products of too diverse commercial use to be of like kind and grade as the Sugarcreek shale and clay. The fact that Sugarcreek shale and clay is of an "average" commercial grade does not mean that their value can be determined by reference to a polyglot category of clays with widely varying values and commercial uses, only some of which approximate those of the Sugarcreek shale and clay.

*Mine No. 4, Taylor*

Claycraft's Taylor mine at Columbus, Ohio produces Bedford shale which is mined by a shale planer. The shale does not have to be crushed. It is taken from the mine and transported to a plant at the same location where it is ground and screened and then manufactured into face brick by extrusion and burning.

The Taylor mine's Bedford shale is of like kind and grade with the Sugarcreek mine's Homewood shale. They are of like kind and grade as all other Ohio shales. For a number of commercial uses, shales and clays are interchangeable, depending upon their particular geological and chemical properties.

The Government contends that the representative market or field price of the Taylor shale is the average price of miscellaneous clays reported in the 1956 and 1959 Minerals Yearbooks published by the United States Bureau of Mines. In 1956 the average price of miscellaneous clays was $0.85 per ton.[14] In 1959

---

11. Claycraft's Sugarcreek operation mined 40,388 tons of clay in 1956. Using the $0.85 per ton figure, the gross income from mining was $34,329.80 ($0.85 x 40,388). The cost of mining was $14,642.68. Net income from mining was $19,687.12. The allowable depletion is the lower of (1) 5% of the gross income from mining (.05 x $34,329.80 = $1,716.49) or (2) 50% of the net income from mining (.50 x $19,687.12 = $9,843.-56). Using the Government's proposed representative field or market value the allowable percentage depletion for the Sugarcreek property for 1956 was $1,716.49.

12. *See* pp. 1362, 1363, *supra*. Claycraft's Sugarcreek operation mined 29,635.71 tons of clay in 1959. Using the $1.21 per ton figure, the gross income from mining at Sugarcreek would have been $35,859.21 ($1.21 x $29,635.71 = $35,859.21). The cost of mining was $27,403.78. Net income from mining was $8,455.43. The allowable depletion is the lower of (1) 5% of the gross income from mining (.05 x $35,859.21 = $1,792,96) or (2) 50% of the net income from mining (.50 x $8,455.43 = $4,227.-72). Using the Government's proposed representative market or field value the allowable percentage depletion for the Sugarcreek property in 1959 was $1,792.96.

13. *See* pp. 1362-1363, *supra*.

14. Claycraft's Taylor operation mined 47,761 tons of shale in 1956. Using the $0.85 per ton figure, the gross income from mining at Taylor would have been $40,596.85 ($0.85 x 47,761 = $40,596.85). Claycraft did not keep records adequately distinguishing costs associated with mining and manufacturing at the Shawnee and Taylor operations, therefore the Government was forced to prove the cost of mining at the Shawnee and Taylor mines together. The total cost of mining at Shawnee and Taylor was $183,277.89. Gross income from mining at Shawnee was $206,256.70. The net income from mining for the operations at Shawnee and Taylor was $63,475.66 [($206,256.70 + 40,596.85) — $183,277.89 = $63,575.-66]. With respect to the Taylor mine the allowable depletion is the lower of (1) 5% of the gross income from mining [for Taylor (.05 x $40,596.85 = $2,029.-84)] or (2) 50% of the net income from mining [for Shawnee *and* Taylor (.50 x $63,575.66 = $31,787.83)]. In 1956 fireclay was entitled to depletion at a greater percentage of gross income. Therefore, the Shawnee allowable depletion is the lower of (1) 15% of the gross income from mining [for Shawnee (.15 x $206,256.70 = $30,938.51)] or (2) 50% of the net income from mining [for Shawnee *and* Taylor (.50 x $63,475.66 =

the average price of miscellaneous clays was $1.21 per ton.[15]

■ For reasons discussed above with reference to the Wyandot and Sugarcreek mining operations the Court holds that the 1956 and 1959 Minerals Yearbook's statistics reporting the tonnage and value of miscellaneous clays in Ohio include mineral products of too diverse commercial use to be of like kind and grade with the Taylor shale for purpose of establishing the representative market or field value of the shale and computing the allowable percentage depletion.

## EVIDENCE OF CONSTRUCTIVE PRICE AS DETERMINED BY PROPORTIONATE PROFITS METHOD

The Government contends that if there is no representative field or market price, Claycraft's constructive income must be determined by the proportionate profits method.

Claycraft argues that the evidence establishes the probability that there is a representative market or field price for the Shawnee fireclay, the Sugarcreek

clay and shale, and the Taylor shale, but the Government failed to prove what such price is.[16] Claycraft goes on to contend that this alleged failure in proof prevents the Government from computing the value of the mineral products by the proportionate profits method because Treasury Regulation 118 provides for the proof of the mineral products value by such method only "if there is no such representative market or field price." The Government, having proven that there was a representative market or field price (but having failed to prove what that is), cannot assert that there is no representative market or field price in order to prove the mineral products value by the proportionate profits method.

Claycraft's construction of Treasury Regulation 118 is too literal. The regulation must be construed to effect its purpose. The regulation is an attempt to provide accurate methods by which a taxpayer may prove the value of its mineral products when their value is not established by sale. The regulation makes the policy choice that proof of the mineral products value by reference to its

---

$31,787.83)]. Because the cost figures necessary for a determination of net income are not available separately for the Shawnee and Taylor operations, the cost of mining at Shawnee and Taylor must be aggregated and the lower of (1) a percentage of gross income or (2) 50% of net income must be determined by aggregated figures. Claycraft's Shawnee and Taylor mining operations are entitled to depletion at the lower of:

(1) .05 x 40,496.85 = $ 2,024.84
    .15 x 206,256.70 = 30,938.51
                        $ 32,963.35

    or

(2) .50 x aggregate net income
    .50 x $63,575.66 = $31,787.83

Using the Minerals Yearbook's figures, the allowable depletion in 1956 is $31,787.83.

15. Claycraft's Taylor operation mined 34,652 tons of shale in 1959. Using the $1.21 per ton figure, the gross income from mining shale at Taylor would have been $41,928.92. (34,652 x $1.21 = 41,928.92). The Taylor and Shawnee

operations mined 66,418 tons of fireclay in 1959. The U.S. Bureau of Mines statistics show the average price of fireclay in Ohio to be $4.04 per ton in 1959. The gross income from mining fireclay in 1959 would be $268,328.72. The total gross income from mining at the Taylor and Shawnee mines, using the Bureau of Mines figures, was $310,257.64. The total cost of mining at the Taylor and Shawnee operations was $172,240.32. The net income from mining for the Taylor and Shawnee operations in 1959 was $138,017.32 ($310,257.64 — $172,240.-32 = $138,017.32). In 1959 the depletion allowance for both shale and fireclay was the lower of 5% of the gross income from mining [.05 x $310,257.64 = $15,512.88] or 50% of the net income from mining [.50 x $138,017.32 = $69,008.66]. Using the U.S. Bureau of Mines Minerals Yearbook figures, the allowable depletion in 1959 is $15,512.88.

16. Claycraft argues that the evidence establishes the probability that there is no field price for the Wyandot glacial drift clay.

representative market or field price is the most reliable method. If the mineral products value cannot be established by reference to a representative market or field price, then the taxpayer (or in this instance the Government) can prove its value by the proportionate profits method or by any other method of computation that "clearly reflects the gross income from the property."

■ In this case the Government sought to prove the value of Claycraft's mineral products by reference to an asserted representative market or field price. The Court has held, as a matter of law, that on the evidence, the Minerals Yearbook's statistics do not establish a representative market or field price because they are not clearly limited to mineral products of like kind and grade as required by Treasury Regulation 118. This is not a failure of proof in the sense that a litigant fails to bring forward probative evidence. The Government, insofar as the record discloses, did all it could by attempting to establish the value of the mineral products by reference to a standard statistical reference in the field. In addition, a Government geologist, Joseph Berman, prepared a list of all non-integrated producers in Ohio during the year 1956 from U. S. Bureau of Mines and Ohio Department of Minerals & Mine publications. The Government attempted to depose all of these producers in an effort to accurately establish the value of Claycraft's mineral products.[17] However, most Ohio producers are integrated miner-manufacturers who do not regularly sell their crude mineral products. This Court has reviewed the depositions of the non-integrated producers and has held and holds, for reasons well briefed by defendant, that the sales by non-integrated producers are of mineral products which are not suitable for the same general commercial use as Claycraft's mineral products and thus cannot, as a matter of law, establish the representative market or field price of Claycraft's mineral products because they are not of like kind and grade.

Claycraft cannot have it both ways. The Government has done the same as any taxpayer would have in similar circumstances in its attempt to establish a representative market or field price. Either it is, or is not, the representative field price as a matter of law. If the Government's proof establishes a representative field or market price, it is entitled to recovery of the refund.[18] If, upon presentation of all available evidence, a representative field price is not established as a matter of law, then there is no reliable way of establishing the value of Claycraft's mineral products by that method, and the Government has the burden of establishing the mineral products' values by the proportionate profits method or other reliable method.[19]

The proportionate profits method under Treasury Regulation 118 has long been judicially accepted as a reliable method of determining gross income from mining for computing allowable depletion under the provisions of 26 U.S.C. §§ 611(a), 613. United States v. Henderson Clay Products, 324 F.2d 7, 16 (5th Cir. 1963); Whitehall Cement Manufacturing Co. v. United States, 369 F.2d 468, 471–472 (3d Cir. 1966); United States v. Portland Cement Co. of Utah, 378 F.2d 91, 93–94 (10th Cir. 1967); United States v. Ideal Basic Industries, Inc., 404 F.2d 122, 125 (10th Cir. 1968), cert. denied, 395 U.S. 936, 89 S.Ct. 1997, 23 L.Ed.2d 451 (1969), rehearing denied, 396 U.S. 975, 90 S.Ct. 423, 24 L.Ed.2d 446 (1969); United States v. California Portland Cement Co., 413 F.2d 161, 170–172 (9th Cir. 1969); Woodward Iron Co. v. Patterson,

---

17. The Government was unable to depose some of the producers because they were no longer in business and could not be located. It did depose a number of non-integrated producers.

18. See footnotes 4, 5, 8, 9, 11, 12, 14 and 15.

19. The Government failing to establish a representative market or field price relies upon the proportionate profits method and does not suggest any other method.

173 F.Supp. 251 (N.D.Ala.1959); United States Pipe & Foundry Co. v. Patterson, 203 F.Supp. 335 (N.D.Ala.1962); Gray Knox Marble Co. v. United States, 257 F.Supp. 632 (E.D.Tenn.1966).

The Court in United States v. Ideal Basic Industries, Inc., *supra*, 404 F.2d, at 125 stated the equation for determining gross income from mining by the proportionate profits method:

$$\text{GROSS INCOME FROM MINING} = \frac{\text{MINING COST}}{\text{TOTAL COST OF MINING AND NONMINING ACTIVITIES INCLUDING THE OVERHEAD AND ADMINISTRATIVE COST ATTRIBUTABLE TO MINING AND NONMINING ACTIVITIES}} \times \text{SALES PRICE OF THE FIRST MARKETABLE PRODUCT [GROSS SALES]}$$

In other words, the sale price of the final manufactured product actually sold by the taxpayer is apportioned to mining according to the relation that the costs of mining have to total costs.

The cost of mining at each of the mining operations in 1956 was as follows:

| | |
|---|---|
| Wyandot | $ 22,627.99 |
| Shawnee-Taylor [20] | 183,277.89 |
| Sugarcreek | 14,642.68 |

The total cost of operation in 1956 was $3,408,649.60. The total profit (net income) of the taxpayer in 1956 was $489,583.08. The gross sales were $3,689,799.38.

The allowable percentage depletion is the lesser of (1) 5% (15% in the case of fireclay) of the gross income from mining[21] or (2) 50% of the net income (profit) from mining.[22]

The total allowable depletion in 1956 is the lesser of: (1) 5% (15% with re-

---

**20.** Claycraft did not keep separate cost figures for the Shawnee and Taylor operations.

**21.** Gross Income from mining $= \dfrac{\text{Mining costs}}{\text{Total costs}} \times$ Gross sales

Wyandot

Gross Income from mining $= \dfrac{22,627.99}{3,408,649.60} \times 3,689,799.38$

$= 22,627.99 \times \dfrac{3,689,799.38}{3,408,649.60}$

$= 22,627.99 \times 1.08$

$= 24,438.23$

Allowable depletion for Wyandot clay $= .05 \times \$24,439.23 = \$1,221.91$

Shawnee-Taylor

Gross Income from mining $= \dfrac{183,277.89}{3,408,649.60} \times 3,689,799.38$

$= 183,277.89 \times \dfrac{3,689,799.38}{3,408,649.60}$

$= 183,277.89 \times 1.08$

$= 197,940.12$

Allowable depletion for the Shawnee fireclay and Taylor shale $= .15 \times \$197,940.12 = \$29,691.02$ [The Taylor shale is only 5%. However, no separate cost data exists for the Taylor and Shawnee mines. The figure most advantageous to Claycraft was used in the computation.]

Sugarcreek

Gross Income from mining $= \dfrac{14,642.68}{3,408,649.60} \times 3,689,799.38$

$= 14,642.68 \times \dfrac{3,689,799.38}{3,408,649.60}$

$= 14,642.68 \times 1.08$

$= 15,814.09$

Allowable depletion for the Sugarcreek shale and clay $= .05 \times \$15,814.09 = \$790.70$
The total possible allowable depletion for all four mines is $31,703.63.
By comparison, Claycraft claimed $104,216.65 depletion on its 1956 income tax return, using the figures of $5.00 a ton for shale and surface clay and $7.00 a ton for fireclay.

**22.** Net Income from mining $= \dfrac{\text{Cost of mining}}{\text{total costs}} \times$ profit

Wyandot

Net Income from mining $= \dfrac{22,627.99}{3,408,649.60} \times 489,583.08$

$= 22,627.99 \times \dfrac{489,583.08}{3,408,649.60}$

$= 22,627.99 \times .14363$

$= \$3,250.06$

Shawnee-Taylor

Net Income from mining $= \dfrac{183,277.89}{3,408,649.60} \times 489,583.08$

$= 183,277.89 \times \dfrac{489,583.08}{3,408,649.60}$

$= 183,277.89 \times .14363$

$= \$26,324.20$

Sugarcreek

Net Income from mining $= \dfrac{14,642.68}{3,408,649.60} \times 489,538.08$

$= 14,642.68 \times \dfrac{489,538.08}{3,408,649.60}$

$= 14,642.68 \times .14363$

$= \$2,103.13$

Total net income from mining $= \$31,677.39$
$.50 \times 31,677.25 = \$15,838.63$

spect to fireclay) of the gross income from mining, $31,703.63; or (2) 50% of the net income from mining, $15,838.63. Therefore, the allowable percentage depletion for 1956 is $15,838.63.

The cost of mining at each of the mining operations in 1959 was as follows:

| Wyandot | $ 26,164.99 |
| Shawnee-Taylor | 172,240.32 |
| Sugarcreek | 27,403.78 |

The total cost of operation in 1959 was $3,388,912.22. The total profit (net income) of the taxpayer in 1959 was $23,123.30. The gross sales were $3,888,214.47.

The allowable percentage depletion is the lesser of (1) 5% of the gross income from mining[23] or (2) 50% of the net income (profit) from mining.[24] Five per cent of the gross income from mining is $12,984.03. Fifty per cent of the net income from mining is $767.78. There-

fore, Claycraft is entitled to a $767.78 percentage depletion allowance in 1959.

Claycraft argues that the Government failed in its proof because it aggregated the cost and income figures from the Shawnee and Taylor mines. Defendant argues the aggregation is improper for three reasons. First, § 613 of the Internal Revenue Code provides for a depletion allowance for each separate mining property. Under § 614(c) a taxpayer may elect to aggregate two or more separate mineral interests if they constitute a part or all of an operating unit. Claycraft goes on to argue that it has not made an election to aggregate the Shawnee and Taylor mines under IRS Regulation 1.614–2(d). Defendant contends that only a taxpayer may elect to aggregate, and that the Government cannot unilaterally aggregate the mining interests to facilitate meeting its burden of proof. Defendant further argues that the mineral interests are not a part of

---

23. $\text{Gross Income from mining} = \frac{\text{Mining costs}}{\text{total costs}} \times \text{gross sales}$

Wyandot

$\text{Gross Income from mining} = \frac{26,164.99}{3,388,912.22} \times 3,888,214.47$

$= \frac{26,164.99}{3,388,912.22} \times 3,888,214.47$

$= 26,164.99 \times 1.15$

$= \$30,089.74$

The allowable depletion for the Wyandot clay is .05 × $30,089.74 = $1,504.49.

Shawnee-Taylor

$\text{Gross Income from mining} = \frac{172,240.32}{3,388,912.22} \times 3,888,214.47$

$= \frac{172,240.32}{3,388,912.22} \times 3,888,214.47$

$= 172,240.32 \times 1.15$

$= \$198,076.37$

The allowable depletion for the Shawnee fireclay and Taylor shale is .05 × $198,076.37 = $9,903.82. [In 1959 Claycraft's fireclay was entitled to the same depreciation as its other mineral products—5%.]

Sugarcreek

$\text{Gross Income from mining} = \frac{27,403.78}{3,388,912.22} \times 3,888,214.47$

$= \frac{27,403.78}{3,388,912.22} \times 3,888,214.47$

$= 27,403.78 \times 1.15$

$= \$31,514.35$

The allowable depletion for the Sugarcreek shale and clay is .05 × $31,514.35 = $1,575.72. The total allowable depletion for the Wyandot, Shawnee, Taylor and Sugarcreek mines at 5% of

gross income from mining is $12,984.03. By comparison Claycraft claimed $25,482.58 in depletion on its 1959 tax return.

24. $\text{Net income from mining} = \frac{\text{Mining costs}}{\text{total costs}} \times \text{Total net income (profit)}$

Wyandot

$\text{Net Income from mining} = \frac{26,164.99}{3,388,912.22} \times 23,123.30$

$= 26,164.99 \times \frac{23,123.30}{3,388,912.22}$

$= 26,164.99 \times .0068$

$\text{Net income from mining} = \$ 177.92$

Shawnee-Taylor

$\text{Net Income from mining} = \frac{172,240.32}{3,388,912.22} \times 23,123.30$

$= 172,240.32 \times \frac{23,123.30}{3,388,912.22}$

$= 172,240.32 \times .0068$

$\text{Net Income from mining} = \$ 1,171.23$

Sugarcreek

$\text{Net Income from mining} = \frac{27,403.78}{3,388,912.22} \times 23,123.30$

$= 27,403.78 \times \frac{23,123.30}{3,388,912.22}$

$= 27,403.78 \times .0068$

$\text{Net Income from mining} = \$ 186.35$

The total constructive net income by proportionate profit from the Wyandot, Shawnee and Taylor mines in 1959 was $1,535.50. The allowable depreciation is .50 × $1,535.51 = $767.78.

one operating unit, and therefore could not be aggregated under any circumstances. In support of the above argument defendant cites Day Mines, Inc. v. Commissioner, 42 TC 337; Estate of Mary Z. Bryan, 22 TCM 865, December 26, 206 M 1963–182; Angelus Milling v. Commissioner, 325 U.S. 293, 65 S.Ct. 1162, 89 L.Ed. 1619 (1945). None of these cases are factually similar enough to the instant case to be controlling.

Second, defendant asserts that the Government arbitrarily allocated indirect costs without regard to the efficiency of the various mining manufacturing operations and without regard to other variables.

Third, defendant contends the Government's allocation of costs was "not sufficiently related to the dividing point between ordinary treatment processes resulting in the first commercially marketable crude mineral product and the costs attributable to process beyond the ordinary treatment processes."

Each of defendant's arguments will be considered in turn.

First, under the circumstances of this case the Government was entitled to prove the cost of mining of the Shawnee and Taylor mines by aggregating the costs.

The Government subpoenaed "all work papers, books and records relating to percentage depletion deductions in the income tax of The Claycraft Company for each of the fiscal years ending November 30, 1956 . . . and November 30, 1959." The only cost figures produced by Claycraft relating to the Shawnee mine and the Taylor mine were in a combined form. See Government's Exhibits 46, 47. Claycraft's President Teff testified that "all of our cost data was supplied to" the Government. The Court concludes that Claycraft did not maintain cost records adequate to separately determine the constructive gross and net income from mining of the Shawnee and Taylor mines.

Under the provisions of 26 U.S.C. § 6001 a taxpayer is required to keep records adequate to enable the Commissioner of Internal Revenue to determine his tax liability. 26 C.F.R. § 320.72. See, Soltermann v. United States, 272 F.2d 387 (9th Cir. 1959); Gibson v. United States, 360 F.2d 457 (5th Cir. 1966); Webb v. C. I. R., 394 F.2d 366 (5th Cir. 1968).

■ Claycraft did not maintain cost records adequate to permit a computation of the allowable depletion for each of its separate mining properties. The Court holds that, under the circumstances, the Government may aggregate the Shawnee and Taylor mines for purposes of proving the allowable depletion for those mining interests.

Second, the taxpayer's argument that inefficient operations are penalized under the proportionate profits method has uniformly been rejected by the courts. United States v. Ideal Basic Industries, supra 404 F.2d at 125; Whitehall Cement Manufacturing Co. v. United States, 369 F.2d 468, 472 (3d Cir. 1966); Gray Knox Marble Co. v. United States, supra 257 F.Supp. at 643.

However, if specific items of cost which are used or excluded so distort the formula as to violate common sense and fairness, they should be included or excluded from the formula as appropriate. See, United States v. Portland Cement Co. of Utah, supra 378 F.2d at 92–94.

■ The evidence in the instant case does not support a finding that the Government included any costs or apportioned any costs in a manner which grossly distorted income from mining. The proportionate profits method is necessarily cost-oriented. The product of an efficient operation is undervalued. Nonetheless, it has been a long standing practice to value mineral product by the proportionate profits method where a constructive value cannot be established by a representative field or market price. There are no special circumstances present which would exempt Claycraft from the operation of Treasury Regulation 118, § 39.23(m)–

1(e)(3) (1939 Code.) The Court concludes that the Government's evidence apportions indirect costs in a manner consistent with the proportionate profits method and the available cost data maintained by Claycraft.

Third, the Government established by a preponderance of the evidence that the costs it included in its summaries were all the costs of producing the first marketable crude mineral product.

In United States v. Cannelton, *supra*, the United States Supreme .Court held that depletion was based on the value of the raw mineral product at its first commercially marketable stage. Under the provisions of 26 U.S.C. § 613(c)(2)

> The term 'mining' includes not merely the extraction of the ores or minerals from the ground but also the ordinary treatment process normally applied by mine owners or operators in order to obtain the commercially marketable mineral product or products.

Mining does not include process used in the manufacture of a finished product.

In the instant case, the Government allocated as a direct cost of mining everything Claycraft listed in its cost summaries as a mining cost. These included the cost of drying the mineral product (where applicable), crushing it, separating it from waste and primary, or rough, grinding.

Claycraft's President Teff referred to several costs of mining he believed were not reflected in the Government's cost data. These included: administrative and selling expenses, capital investments and some labor costs at the Shawnee mine. Contrary to Mr. Teff's testimony all these costs were included in the Government's computations. Administrative and selling costs and capital expenditures were apportioned between mining and non-mining activities and the part attributable to mining was included as an indirect mining cost. All mining costs, including labor, which were so identified in Claycraft's cost records were included in the Government's computations. The Government cannot be penalized to the extent that the data may include inaccuracies resulting from failure to keep adequate tax records.[25]

## CONCLUSION

The Government has proved by a preponderance of the evidence that Claycraft is entitled to percentage depletion for 1956 in the total amount of $15,838.-64.[26] Using this figure, Claycraft's total tax liability for 1956, without reference to the 1959 loss carryback, is $242,471.57. The refund was computed on a tax liability of $155,506.37. Thus, the entire refund of $42,009.09 was erroneous.

The Government has proven by a preponderance of the evidence that Claycraft is entitled to percentage depletion for 1959 in the total amount of $767.78. This increases the taxpayer's net income for 1959 to $24,714.82 which eliminates the entire amount of the claimed net operating loss carryback. Consequently, the entire refund of $7,994.05 was erroneous.

Clerk of Courts to enter judgment against defendant in the amount of $50,003.14 plus interest at six per cent per annum on $42,009.09 from February 2, 1960 and on $7,994.05 from April 14, 1960.

---

25. *See* p. 1370, *supra.*

26. *See* pp. 1368–1369, *supra* and footnote 22.